# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In re:

**Fourteenth Avenue Cartage Company, Inc.,**

Case No. 19-54128
Chapter 11
Hon. Maria L. Oxholm

    Debtor.

_____/

## DEBTOR'S FIRST AMENDED COMBINED
## PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

**PREPARED BY**:

WERNETTE HEILMAN PLLC
Ryan D. Heilman (P63952)
Michael R. Wernette (P55659)
Attorneys for Debtor
40900 Woodward Ave., Suite 111
Bloomfield Hills, MI 48304
(248) 835-4745
ryan@wernetteheilman.com


      THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF DEBTOR'S PLAN.  ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PLAN AND THE DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN. NOR SHOULD THE INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.

      *DEBTOR WILL REMOVE THE ABOVE STATEMENT AFTER PRELIMINARY APPROVAL OF THE DISCLOSURE STATEMENT AND BEFORE DISSEMINATION TO CREDITORS.*

      DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS PLAN AND THE DISCLOSURE STATEMENT AT ANY TIME.

## DEBTOR'S CHAPTER 11 PLAN

## ARTICLE I
## DEFINITIONS, RULES OF
## INTERPRETATION AND COMPUTATION OF TIME

1.1     **Scope of Definitions.**

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined have the meanings given them in section 1.2 of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules, will have the meaning given that term in the Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules.

1.2     **Definitions.**

1.2.1     "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the business of Debtor, including wages, salaries, commissions for services rendered after the Petition Date, Professional Claims, taxes accruing after the Petition Date, whether or not the last payment date is before or after the Confirmation Date, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c) of the Bankruptcy Code, provided, however, that this term does not include any portion of Allowed Secured Claims, whether or not all or part of Allowed Secured Claim is entitled to priority under sections 503(b), 507, 363, or 364 of the Bankruptcy Code or otherwise.

1.2.2     "**Administrative Claims Bar Date**" means the deadline requests for payment of Administrative Claims (or proofs of claims requesting Administrative Claim status if permitted by Court order), which shall be 60 days after the Effective Date.

1.2.3     "**Affiliates**" has the meaning given it by section 101(2) of the Bankruptcy Code.

1.2.4     "**Allowed**" means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Allowed Interest of the type described in the Class

1.2.5     "**Allowed Claim**" means a Claim or any portion of the Claim,

a.     that has been Allowed by a Final Order of the Bankruptcy Court (or such other court or forum with jurisdiction to adjudicate the Claim and objections to it);

b.     as to which a Proof of Claim has been timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, but only to the extent that the Claim is identified in the Proof of Claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been Filed within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied or overruled by a Final Order;

c.      as to which no Proof of Claim has been Filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of the liquidated amount and (ii) no objection to its allowance has been Filed by Debtor, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court; or

d.      that is expressly Allowed in a liquidated amount in this Plan.

1.2.6   "**Allowed Class . . . Claim**" or "**Allowed Class ... Interest**" means an Allowed Claim or an Allowed Interest in the specified Class.

1.2.7   "**Allowed Interest**" means an ownership Interest in Debtor, which has been or is later listed by Debtor in its books and records as liquidated in an amount and not disputed or contingent; provided, however, that to the extent an Interest is a Disputed Interest, the determination of whether the Interest will be Allowed and/or the amount of any Interest will be determined in the manner in which the Interest would have been determined if the Chapter 11 Case had not been commenced; and provided further, however, that proofs of Interest need not be Filed in the Bankruptcy Court with respect to any Interests; and provided further, however, that Debtor, in its discretion, may bring an objection or motion with respect to a Disputed Interest before the Bankruptcy Court for resolution.

1.2.8   "**Avoidance Claims**" means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute the Causes of Action.

1.2.9   "**Ballot**" means each of the ballot forms that is distributed with the Disclosure Statement to Holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under the terms of this Plan.

1.2.10  "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date.

1.2.11  "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the Eastern District Michigan, or such other court that may have jurisdiction over the Chapter 11 Case.

1.2.12  "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings in the Chapter 11 Case, and the Local Rules of the Bankruptcy Court.

1.2.13  "**Bar Date**" means the deadlines set, or to be set, by the Bankruptcy Court for filing proofs of claim in the Chapter 11 Case.

1.2.14  "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Detroit, Michigan.

1.2.15 "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.2.16 "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Claims, unless otherwise waived or released by Debtor to the extent the Cause of Action is a Cause of Action held by Debtor.

1.2.17 "**Chapter 11 Case**" or "**Case**" means this chapter 11 case number 19-54128, currently pending in the United States Bankruptcy Court for the Eastern District of Michigan.

1.2.18 "**Chemical Bank Claims**" means the Claims held by Chemical Bank, a division of TCF National Bank ("Chemical Bank"), and as set forth in Proofs of Claim Nos. 4, 6, 7 and 8, Filed in this Chapter 11 Case.

1.2.19 "**Claim**" means a claim against Debtor, whether or not asserted, as defined in § 101(5) of the Bankruptcy Code.

1.2.20 "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.21 "**Committee**" means the Official Committee of Unsecured Creditors appointed in this Case by the United States Trustee's office.

1.2.22 "**Confirmation**" means the entry of a Confirmation Order on the docket of the Chapter 11 Case.

1.2.23 "**Confirmation Date**" means the date of entry of the Confirmation Order.

1.2.24 "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and related matters, as may be adjourned or continued from time to time.

1.2.25 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

1.2.26 "**Creditor**" means any creditor of Debtor as defined in section 101(10) of the Bankruptcy Code.

1.2.27 "**Debtor**" means Fourteenth Avenue Cartage Company, Inc. and, after the Effective Date, Reorganized Debtor.

1.2.28 "**Debtor Trust**" means the trust established as of the Effective Date for the purpose of collecting and distributing funds to Class IV Claim Holders, as a distinct and separate entity from the Reorganized Debtor.

4

1.2.29 "**Disallowed Claim**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

1.2.30 "**Disclosure Statement**" means the written disclosure statement, as amended, (including all attached and referenced schedules) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.2.31 "**Disputed Claim**" or "**Disputed Interest**" means a Claim or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest.

1.2.32 "**Effective Date**" means the Confirmation Date except, if an Equity Auction is held, the date the Equity Auction has been completed and any cash consideration has been fully paid.

1.2.33 "**Entity**" has the meaning set forth at section 101(15) of the Bankruptcy Code.

1.2.34 "**Equity Auction**" means the potential auction of the Reorganized Debtor's equity interests as set forth in Article IV.

1.2.35 "**Estate**" means the bankruptcy estate of Debtor created pursuant to section 541 of the Bankruptcy Code.

1.2.36 "**Exhibit**" means any exhibit or schedule attached to this Plan, the Disclosure Statement, or incorporated into either by reference, including any amendments and supplemental exhibits or schedules that may be filed subsequent to filing of the Plan and Disclosure Statement.

1.2.37 "**File**" means to file with the Bankruptcy Court in the Chapter 11 Case or such other court with jurisdiction over the relevant subject matter.

1.2.38 "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

1.2.39 "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely Filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be Filed has been resolved by

5

the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

1.2.40 "**Financing Leases**" means unexpired leases entered into by the Debtor for the purpose of financing the purchase of trailers or other equipment.

1.2.41 "**General Unsecured Claim**" means any Claim that is not otherwise an Administrative Claim, Priority Tax Claim, Priority Claim, or Secured Claim. General Unsecured Claims include Claims of Creditors that are secured by Liens on property belonging to the Debtor (collateral) if the Secured Claims with senior priority are greater than the value of Debtor's interest in the collateral.

1.2.42 "**General Unsecured Claim Payment**" means the payments to be made to Holders of General Unsecured Claims during the Payment Period as set forth in section 3.4.

1.2.43 "**Governmental Unit**" has the meaning set forth at section 101(27) of the Bankruptcy Code.

1.2.44 "**Holder**" means a Person holding a Claim, Interest, or Lien.

1.2.45 "**Impaired**" refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.2.46 "**Insider**" has the meaning set forth at section 101(31) of the Bankruptcy Code.

1.2.47 "**Insider Claim**" means a Claim held by an Insider.

1.2.48 "**Interest**" means the legal, equitable, contractual, and other rights of any Person with respect to equity securities of, or ownership interests in Debtor.

1.2.49 "**Interest Rate**" means the interest rate set forth in this Plan or, if no specific rate of interest is set forth in this Plan with respect to a Claim which is entitled to be paid with interest, shall mean (a) with respect to a claim for taxes, the interest rate applicable under non-bankruptcy law, (b) with respect all Allowed Secured Claims based on a pre-petition contract, the non-default rate set forth in the respective loan documents as of the Effective Date; (c) for all other Claims entitled to interest under the Bankruptcy Code and this Plan, the prime rate of interest as of the Effective Date, or (d) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.2.50 "**IRC**" means the Internal Revenue Code of 1986, as amended.

1.2.51 "**IRS**" means the Internal Revenue Service.

1.2.52 "**Jebco**" means Jebco Investments, L.C., an Insider and owner of the majority of the property on which Debtor conducts its business.

1.2.53 "**Jebco Property**" means the property owned by Jebco and leased by Debtor and on which Debtor conducts the majority of its operations and stores its trailers and other property.

1.2.54 "**Lien**" has the meaning set forth at section 101(37) of the Bankruptcy Code.

1.2.55 "**Notice**" with respect to a notice to be provided to Debtor means a written notice delivered to and actually received by Debtor and Debtor's counsel at the addresses set forth in section 13.5 or such other address as is provided by Debtor or Debtor's counsel.

1.2.56 "**Payment Period**" means the three-year period during which the Reorganized Debtor shall make payments to General Unsecured Creditors under this Plan.

1.2.57 "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.2.58 "**Petition Date**" means October 3, 2019, the date Debtor Filed its petition for relief in the Bankruptcy Court.

1.2.59 "**Plan**" means this first amended plan for the resolution of outstanding Claims and Interests in the Chapter 11 Case, including all Exhibits, supplements, appendices, and schedules, either in its present form or as it may be altered, amended, or modified in accordance with the Bankruptcy Code and Bankruptcy Rules.

1.2.60 "**Priority Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

1.2.61 "**Priority Tax Claim**" means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.2.62 "**Proof of Claim**" means a proof of Claim Filed against Debtor in the Chapter 11 Case.

1.2.63 "**Pro Rata**" means (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise and (b) with respect to Interests, at any time, the proportion that the number of Interests held by an Interest Holder in a particular Class or Classes bears to the aggregate number of all Interests (including Disputed Interests, but excluding Disallowed Interests) in such Class or Classes.

1.2.64 "**Professional**" means any Person retained in the Chapter 11 Case by Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise.

1.2.65 "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and before and including the Effective Date.

1.2.66 "**Purchaser**" means the successful purchaser at the Equity Auction, if the Equity Auction is held, as set forth in Article IV.

1.2.67 "**Reorganized Debtor**" means Fourteenth Avenue Cartage, Inc., a company to be formed as of the Effective Date as set forth in Article IV.

1.2.68 "**Retained Actions**" means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which Debtor or Debtor's Estate may hold against any Person, including, without limitation, Claims and Causes of Action brought before the Effective Date or identified in the Schedules or Disclosure Statement, other than Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court before the date of this Plan.

1.2.69 "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.2.70 "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs Filed in the Chapter 11 Case by Debtor.

1.2.71 "**Secured Claim**" means a Claim secured by a security interest in or a lien on property in which Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by Debtor and the Holder of such Claim.

1.2.72 "**Security**" has the meaning set forth at section 101(49) of the Bankruptcy Code.

1.2.73 "**Unimpaired**" means, with respect to a Claim, any Claim that is not Impaired.

1.2.74 "**Voting Deadline**" means the deadline set for the receipt of Ballots by Debtor or Debtor's agent under an applicable order entered or to be entered by the Bankruptcy Court.

1.3 **Rules Of Interpretation:** For purposes of this Plan, unless otherwise provided herein:

1.3.1 Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, include, both the singular and the plural.

1.3.2 Each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter.

1.3.3 Any reference in this Plan to an existing document or schedule Filed or to be Filed means the document or schedule, as it may have been or may be amended, modified, or supplemented. Except as otherwise ordered by the Bankruptcy Court, all Exhibits, as amended, modified or supplemented, are incorporated by reference into this Plan and Disclosure Statement for all purposes.

1.3.4 Any reference to an Entity or Person as a Holder of a Claim or Interest includes that Entity's or Person's successors and assigns. Any reference to Debtor includes the Reorganized Debtor for all periods after the Effective Date.

1.3.5 Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially on such terms and conditions.

1.3.6 The words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan.

1.3.8 Subject to the provisions of any contract, certificates of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. To the extent that reference to state law is required, the Plan is governed by the substantive law of Michigan.

1.3.9 The rules of construction in section 102 of the Bankruptcy Code apply. The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous. However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

1.4 **Computation of Time.** In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 apply. Whenever any action is required to be performed or deadline expires on a specific date, if the date falls on a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006), the action may be performed, or the deadline will expire, on the next day that is not a Saturday, Sunday, or legal holiday.

1.5 **References to Monetary Figures**. All references in this Plan to monetary figures refer to currency of the United States of America.

1.6 **Exhibits**. All Exhibits are incorporated into and are a part of this Plan and Disclosure Statement as if set forth in full herein and, to the extent not attached to this Plan, the Exhibits shall be filed with the Bankruptcy Court. Upon its filing, the Exhibit may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://ecf.mieb.uscourts.gov. The Exhibits may also be requested in writing from Debtor's counsel. **All Exhibits may be revised before the Confirmation Date by the filing of the revised Exhibits with the Bankruptcy Court, so long as the revised Exhibits are substantially in conformance with the terms of this Plan.** The Exhibits are an integral part of the Plan, and entry of the Confirmation Order by the Bankruptcy Court will constitute an approval of the Exhibits.

1.7 **No Admissions; Estimates of Claims**. Unless expressly stated otherwise, nothing herein will be deemed to be an admission by Debtor or to otherwise prejudice Debtor in any claims objection or Cause of Action. All estimates of Causes of Action and Claim amounts listed in this Plan, the Disclosure Statement, and Exhibits are current estimates only. All Claims amounts and classifications remain subject to the Claims Objection process as set forth in Article XII.

9

**ARTICLE II**
**CLAIMANTS THAT ARE NOT SUBJECT TO**
**CLASSIFICATION AND ARE NOT ENTITLED TO VOTE ON THE PLAN**
**ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS**

2.1 **Administrative Claims.**

Subject to the provisions of this Plan, on the later of (i) an Administrative Claim becomes an Allowed Administrative Claim, (ii) the date when an Administrative Claim becomes payable pursuant to any agreement between Debtor and the Holder of the Administrative Claim, or (iii) the Effective Date, Debtor shall commence making payments to the Holder of each Allowed Administrative Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash in six equal monthly installments that together total the unpaid portion of such Allowed Administrative Claim or such other treatment that Debtor or Reorganized Debtor and the Holder of the Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Administrative Claims incurred by Debtor in the ordinary course of business during the Chapter 11 Case or arising under contracts assumed during the Chapter 11 Case prior to, on, or as of the Effective Date will be deemed Allowed Administrative Claims and paid by Debtor, at Reorganized Debtor's option (a) through six equal monthly payments as set forth above, (b) in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, or (c) pursuant to any written agreement between Debtor and counter-party or any Court Order. This Section does not require Debtor to make payments on any Disputed Administrative Claim until such time as the dispute has been resolved by consent with the Holder of the Administrative Claim or by a Final Order. Debtor may setoff amounts owed by the Holder of any Administrative Claim, including Causes of Action, against the Administrative Claim, and such setoff, if applicable, shall be a defense to allowance of the Administrative Claim.

2.2 **Priority Tax Claims.**

2.2.1    The Holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of its Allowed Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment of the outstanding amount of the Allowed Priority Tax Claim in equal monthly installments commencing on the date that is 60 days after the Effective Date, with interest accruing at the Interest Rate, calculated so that the last monthly payment will occur on or before February 5, 2023, the fifth anniversary of the Petition Date. Debtor may pre-pay any Priority Tax Claim. For the avoidance of doubt, all taxes of the type entitled to priority under 11 U.S.C. section 507(a) that have been assessed prior to the Petition Date are subject to this section 2.2.

2.2.2    Debtor reserves the right to continue or commence a challenge as to any Priority Tax Claim through the claims objection process set forth in Article XII of this Plan or through any appropriate adjudicative body with necessary jurisdiction, which challenge may include, but need not be limited to, a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the computation of the tax. The right to challenge these claims includes, without limitation, an objection to the assessment of Debtor's real or personal property that may or may not have been made by the respective taxing authority.

2.3 **Professional Claims.**

    2.3.1 **Final Fee Applications.** All final requests for payment of Professional Claims must be Filed by any deadline set by the Court or, in any event, no later than fourteen days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses will be determined by the Bankruptcy Court and paid by Debtor promptly after they are Allowed as set forth in Section 2.1 or as otherwise agreed in writing by Debtor and the Professional.

    2.3.2 **Post-Confirmation Date Retention.** Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date or to make any disclosures pursuant to Bankruptcy Rules 2014 and 2016 will terminate, and Debtor and Reorganized Debtor shall employ and pay Professionals in the ordinary course of business.

2.4     **Substantial Contribution Compensation and Expenses Bar Date.** Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application with the clerk of the Bankruptcy Court on or before the Administrative Claims Bar Date and serve such application on counsel for Debtor and other parties as may be directed by the Bankruptcy Court on or before such date, or be forever barred from seeking such compensation or expense reimbursement. The Court will determine any timely filed request for compensation or expense reimbursement made under this section 2.4, and Debtor shall pay any Allowed amount within sixty days of entry of a Final Order.

2.5     **Pre-petition Administrative Claims.** All Administrative Claims incurred before the Petition Date, including (but not limited to) Administrative Claims arising under 11 U.S.C. § 503(b)(9), must be Filed by the Holder of such Claims by any applicable Bar Date as set by the Federal Rules of Bankruptcy Procedures, the Bankruptcy Court's Local Rules, or by Order of the Bankruptcy Court in this Chapter 11 Case. If any Administrative Claim has not been Filed by the Applicable Bar Date, the Administrative Claim shall be disallowed without the need for Debtor to file any objection to the Administrative Claim.

2.6     **Other Administrative Claims**. All other requests for payment of an Administrative Claim (other than as set forth in this Article II) must be Filed and served on Debtor's and Reorganized Debtor's counsel by the Administrative Claims Bar Date, except that any Administrative Claim not already Filed and required to have been Filed before a Bar Date is automatically disallowed. Any request for payment of an Administrative Claim pursuant to this section 2.6 that is not timely Filed and served is automatically disallowed without the need for any objection by Debtor. After the Effective Date, Debtor may settle an Administrative Claim without further Bankruptcy Court approval. Unless Debtor objects to an Administrative Claim (unless such objection period is extended by the Bankruptcy Court) by the later of (i) 60 days after the Administrative Claims Bar Date or (ii) 30 days after the filing of the Administrative Claim, the Administrative Claim will be deemed Allowed in the amount requested. In the event that Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of the Administrative Claim.

**ARTICLE III**

**SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS
NOT IMPAIRED UNDER THE PLAN AND THOSE IMPAIRED UNDER THE PLAN**

The Plan divides Claims and Interests into four (4) Classes and treats them as follows:

3.1     **Class I**:          Class I consists of the Chemical Bank Claims.

       3.1.1.   The Allowed Chemical Bank Claims shall be deemed to be fully secured Claims under 11 U.S.C. § 506(b). Chemical Bank may File updated Proofs of Claim including all accrued interest and fees as of the Effective Date no later than thirty days after the Confirmation Date. Debtor may object to the reasonableness of legal fees and expenses during the pendency of this Chapter 11 case, and waives its right to object to the imposition of a default rate of interest during the pendency of this Chapter 11 case so long as those rates do not exceed the rates shown in Chemical Bank's proofs of claim.

       3.1.2.   The Allowed Secured Chemical Bank Claims shall accrue interest at the rates set forth herein and shall be paid in full as follows:

      (i)          Reorganized Debtor shall pay interest at the following rates:
          a.  POC 8 (loan 3236)   7.25% (Prime + 4 variable)
          b.  POC 6 (loan 4357)   5.87% (Fixed)
          c.  POC 7 (loan 9607)   4.3% (Fixed)
          d.  POC 4 (loan 3091)   3.25% (Prime variable)
          e.  The floor (minimum) interest rate for POC 8 is 7.25% and for POC 4 is 3.25%.

(ii) Reorganized Debtor shall make equal monthly payments over a three-year Payment Period commencing on the twenty-eighth day of July, 2020 and continuing on the twenty-eighth day of each month thereafter, and (ii) a final payment due on the third anniversary of the Effective Date equal to all remaining unpaid amounts of the Allowed Secured Chemical Bank Claims owing on that date plus accrued interest. The monthly payments shall be calculated based on a fifteen-year amortization schedule for POC 8, 6, and 7 and a five-year amortization schedule for POC 4. Each payment may be allocated to the loans, fees and expenses at Chemical Bank's discretion.

(iii) As soon as possible after the Effective Date and, in no event more than six months after the Effective Date, Jebco shall sell or refinance all the trailers owned by Jebco with all proceeds of the sale to be provided to Chemical Bank to be applied against Chemical Bank's Claim Filed as Proof of Claim No. 4. In the event the proceeds are in excess of the amounts then owing on Proof of Claim No. 4, Chemical Bank may allocate the remaining proceeds as it elects. Chemical Bank may veto any proposed sale or refinancing of the Jebco trailers in which event Jebco shall have a period of three months after the exercise of such veto to comply with its obligations under this subsection.  Failure to complete this sale or refinance shall be a default under this Plan.

(iv) Within two years after the Effective Date, Jebco shall refinance the Jebco Property with all with all proceeds of the refinancing to be provided to Chemical

Bank to be applied first against Chemical Bank's Claim Filed as Proof of Claim No. 7. Chemical Bank may allocate the remaining proceeds as it elects. Chemical Bank may veto any proposed sale or refinancing of the Jebco Property in which event Jebco shall have a period of one year after the exercise of such veto to comply with its obligations under this subsection.

(v) Upon the receipt of any proceeds under subsections (ii) or (iii), above, or if Reorganized Debtor pays to Chemical Bank the proceeds of any other sale or refinancing, the payment obligations under subsection (ii) shall be recalculated taking into account the prepayment of proceeds. Upon completion of the sale or refinance under subsection (iii) above, if any amount remains owing on Proof of Claim No. 4, the payment obligation for this claim under subsection (ii) shall be recalculated based on a 15 year amortization.(amortization time period starting at the Effective Date).

3.1.3.   The Reorganized Debtor may pre-pay all or any portion of the Bank Debt at any time without penalty. Any partial pre-payment shall be applied to the principal amount of the Allowed Secured Chemical Bank Claim as specified by Reorganized Debtor, but shall not affect the amount of the monthly payments or the Reorganized Debtor's obligation to continue making monthly payments under Section 3.1.2 until the Chemical Bank Claims have been paid in full (except as otherwise set forth in section 3.1.2).

3.1.4.   The Reorganized Debtor shall maintain all deposit accounts at Chemical Bank until all claims of Chemical Bank are paid in full.  The current lockbox setup will remain in place and all payments from account debtors will be directed to Chemical Bank.

3.1.5.   All reporting requirements of the Cash Collateral Order entered in the Case (Docket 50) shall continue post-confirmation unless modified by Chemical Bank and the Reorganized Debtor in writing.  In addition, Chemical Bank may obtain a field audit with regard to the business records of the Reorganized Debtor annually.  The expense of any field audits shall be a loan expense recoverable from the Reorganized Debtor.

3.1.6.   The Reorganized Debtor shall maintain accounts receivable and cash at the amount of $1,600,000 or more as more fully defined in the Cash Collateral Order entered in this Case (Docket 50, paragraph 3.b.).

3.1.7.   The Reorganized Debtor shall provide its Billing Activity Report on a weekly basis and maintain invoicing equal to or greater than $275,000 for the prior week.

3.1.8.   The Reorganized Debtor, or Jebco, shall continue to escrow funds for payment of real estate taxes in the current amount of $2,032.87 per month, which amount is subject to change in accordance with Chemical Bank's procedure for recalculating tax escrows from time to time.

3.1.9.   If the Reorganized Debtor discontinues providing services to FCA, or is notified by FCA that its contract to provide services is or will be terminated, the Reorganized Debtor will immediately inform Chemical Bank of the same and Chemical Bank may immediately suspend or terminate the right of the Reorganized Debtor to use funds on deposit or receipts from account debtors.

3.1.10. Until full satisfaction of the Allowed Secured Chemical Bank Claims, Chemical Bank will retain its Liens on all property of Debtor and Reorganized Debtor on which

Chemical Bank had a valid prepetition or postpetition Lien, to secure the Chemical Bank Claims. Chemical Bank's Liens will maintain the same priority, validity, and enforceability as existed immediately before the Petition Date or as set forth in any order of the Bankruptcy Court. Upon a default that is not cured as set forth in this Section 3.1, Chemical Bank may exercise any and all Lien rights against property subject to its Liens to obtain satisfaction of the Allowed Secured Chemical Bank Claims.

3.1.11. Nothing in this Plan shall impair Chemical Bank's claims and rights against or with respect to Jebco or any other person or entity that is liable on the Chemical Bank Claim, including co-obligors and guarantors. So long as the co-obligors and guarantors agree to the terms of this Plan, Chemical Bank may exercise its Lien rights against property subject to its Liens only after a default that is not cured as set forth in this section, and Chemical Bank shall not pursue any other rights against Jebco or any other co-obligors or guarantors unless Reorganized Debtor has defaulted in its payment obligations under this Plan to Chemical Bank and has not cured such default as set forth in this Section 3.1.

3.1.12. In the event of a default by Reorganized Debtor of its obligations to Chemical Bank under subsections 3.1.1 through 3.1.5, and 3.1.7 through 3.1.9, Reorganized Debtor shall have a 14-day opportunity to cure after Notice and, if the default is not timely cured, Chemical Bank may exercise all its rights against all property subject to Chemical Bank's Liens under applicable law, and may file appropriate actions to aid in such relief in this Court or in any other court of applicable jurisdiction. Among other rights, Chemical Bank may elect to proceed against the Jebco Property either (i) as permitted under applicable law or (ii) by requesting that Reorganized Debtor list and sell the Jebco Property through a broker reasonably acceptable to Chemical Bank. In the event that Chemical Bank elects the second option, Jebco agrees that it will waive any redemption rights upon a sale of the Jebco Property.

3.1.13. In the event of a default by Reorganized Debtor of its obligations to Chemical Bank under subsection 3.1.6, Chemical Bank may immediately suspend any right to withdraw funds on deposit, immediately set off any funds, and apply all funds received from account debtors to pay the obligations owing to Chemical Bank. Chemical Bank shall notify Reorganized Debtor of the default, but there is no notice required before Chemical Bank exercises its rights. Chemical Bank may exercise all its rights against all property subject to Chemical Bank's Liens under applicable law, and may file appropriate actions to aid in such relief in this Court or in any other court of applicable jurisdiction. Among other rights, Chemical Bank may elect to proceed against the Jebco Property either (i) as permitted under applicable law or (ii) by requesting that Reorganized Debtor list and sell the Jebco Property through a broker reasonably acceptable to Chemical Bank. In the event that Chemical Bank elects the second option, Jebco agrees that it will waive any redemption rights upon a sale of the Jebco Property.

3.1.14. If the Reorganized Debtor fails to cure a default within the period set forth in the preceding subsections, Chemical Bank may impose the default rates set forth in the existing pre-petition agreements, which in general impose a 5 percentage point increase in the interest rate.

3.1.15. All Avoidance Claims against Chemical Bank are waived.

3.1.16. If an Equity Auction takes place under the terms of this Plan, and that Equity Auction results in a change of ownership of the Reorganized Debtor, then Chemical Bank may demand full payment of all indebtedness without further notice.

3.1.17. **This Class is Impaired**.

3.2 **Class II:** Class II consists of the Allowed Secured Claims, if any, arising from the Financing Leases held by BMO Harris Bank N.A., Penske Track Leasing Co., L.P., Capital Alliance Corporation, Banc of America Leasing & Capital, LLC, Wells Fargo Bank, N.A., and Compass Lease, LLC. To the extent that none of the Claims of any of the foregoing or any other Financing Lease Claim Holders are Secured, this is an empty Class.

3.2.1 The Allowed Claims held by BMO Harris Bank N.A., Penske Track Leasing Co., L.P., Capital Alliance Corporation, Banc of America Leasing & Capital, LLC, Wells Fargo Bank, N.A., and Compass Lease, LLC are Class II Claims if and only if the respective Financing Leases are determined by the Court to be disguised Security Interests and not true leases. To extent any or all of the Financing Leases are not determined to be disguised Security Interests, the Financing Leases will be assumed or rejected as set forth in Article XI of this Plan. Any resulting rejection damages shall be treated as General Unsecured Claims and any Allowed cure claims shall be treated as set forth in Articles XI and II of this Plan.

3.2.2 Debtor or Reorganized Debtor may request a Court determination that any Trailer Financing Lease is a disguised Security Interest at any time before the Trailer Financing Lease is finally assumed or rejected as set forth in Section XI.

3.2.3 Debtor shall satisfy the Allowed Class II Claims, if any, in one of four alternate treatments:

(a) Debtor may retain any or all trailers or other equipment securing Class II Claim and pay the Allowed Class II Claim Holder the lesser amount of (i) the full value of the retained trailers or (ii) the full amount of Class II Claim; each through 60 equal monthly payments beginning 30 days after the later of the Effective Date or the date the Court makes a determination as to the existence of the Class II Claim ("Determination Date"), with interest accruing from the Effective Date at the Interest Rate;

(b) Debtor may retain a trailer or other equipment securing Class II Claim and, within 90 days after the Effective Date or Determination Date, cure all arrearages under the Financing Lease for the trailer, and make payments under the contract for the remainder of the contract term;

(c) Debtor may return the trailer or other equipment to the Holder of the Class II Claim within 30 days after the Effective Date or Determination Date, and any deficiency shall be treated as a General Unsecured Claim under section 3.4; or

(d) Debtor may seek to avoid any Security Interest or Lien securing the Class II Claim and, to the extent successful, the Class II Claim shall be treated as a General Unsecured Claim under section 3.4.

3.2.4 Debtor may pre-pay part or all of an Allowed Class II Claim at any time without penalty. Until satisfaction of an Allowed Class II Claim in full or avoidance of Security Interests, the Holder of the Class II Claim will retain its Liens on all collateral securing the Class II Claims, if any, to the same extent and with the same priority as existed immediately before the Petition Date.

15

3.2.5  In the event of a default by Reorganized Debtor of its obligations to the Holder of an Allowed Class II Claim under this <u>section 3.2</u>, Reorganized Debtor shall have a 21-day opportunity to cure after Notice and, if the default is not timely cured, the Holder of the Allowed Class II Claim may exercise all its rights against all property subject to the Holder's Liens under applicable law, and may file appropriate actions to aid in such relief in this Court or in any other court of applicable jurisdiction.

3.2.6  **This Class is Impaired.**

3.3  **Class III:** This Class consists of the Allowed Secured Claims of Inland Finance Company.

3.3.1  Debtor shall satisfy the Allowed Class III Claims by returning the collateral to the Holder of the Class III Claim within 30 days after the Effective Date. The Class III Claim Holder may File a Claim no later than thirty days after the Effective Date for any deficiency and, if Allowed, such Claim shall be treated as a General Unsecured Claim under <u>section 3.4</u>.

3.4  **Class IV:** This Class consists of all Allowed General Unsecured Claims. The undersecured amounts, if any, of Class II and Class III Claims shall also be treated as General Unsecured Claims under this <u>section 3.4</u>.

3.4.1  Reorganized Debtor shall make 48 monthly distributions to the Debtor Trust on behalf of Holders of Allowed Class IV Claims. The first three distributions shall be of $15,000 each. The subsequent 45 monthly distributions shall be of $24,000 each. However, in the event that the non-subordinated Allowed Class IV Claims exceed $3,375,000, Reorganized Debtor shall make the subsequent 45 monthly distributions in an amount calculated so that all 48 distributions together shall equal 1/3 of all non-subordinated Allowed Class IV Claims.

3.4.2  The distributions set forth in Section 3.4.1 shall commence on the earlier of (i) the first day of the month following the month that Reorganized Debtor's revenues equal or exceed the projections set forth in Debtor's original Combined Plan and Disclosure Statement filed at docket number 149, or (ii) January 4, 2021. Each subsequent distribution shall be due on the first business day of each month until all 48 distributions have been made. Notwithstanding the foregoing, Reorganized Debtor's obligation to make any monthly distribution to the Debtor Trust is conditioned on Reorganized Debtor's accounts receivable and cash being equal to or greater than $1,800,000 the preceding month in which the distribution is to be made (the "Cash/Receivable Floor"). The Cash/Receivable Floor is to be calculated in the same manner and time as calculated by Chemical Bank, as referenced in ¶ 3.1.6 of this Amended Plan, and as defined in the Cash Collateral Order entered in this Case (Docket 50, paragraph 3.b.). In the event the Cash/Receivable Floor condition is not met for any month, the Reorganized Debtor shall not make a distribution until the month after the Cash/Receivable Floor condition has been satisfied. This condition does not reduce the number of monthly distributions that must be made by the Reorganized Debtor and any suspended distribution must be paid by increasing the period of time during which distributions are to be made to the Debtor's Trust.

3.4.3  In addition, to the distributions required under Section 3.4.1, Reorganized Debtor shall make additional payments to the Debtor Trust for each full calendar year that Reorganized Debtor is making payments under Section 3.4.1 ("Kicker Payments"). Kicker Payments shall be calculated at the end of each calendar year, beginning at the end of 2021, based on the difference between actual gross sales generated by Reorganized Debtor minus projected gross sales set forth in Debtor's disclosure statement. For every $100 actual gross sales exceed projected gross sales for the preceding calendar year, Reorganized Debtor shall be

16

obligated to pay $4 to the Debtor Trust, with a cap of $150,000 per year ("Kicker Cap"). If the Kicker Cap is not met in any year, the unpaid portion shall increase the Kicker Cap for the succeeding year. For example, if the Kicker Payment required for 2021 is $120,000 ($30,000 less than the Kicker Cap), the Kicker Cap for 2022 shall be increased by $30,000 to $180,000. For the avoidance of doubt, the gross sales benchmarks are as follows: 2021: $14,687,449; 2022: $15,128,073; 2023: $15,128,073; 2024: $15,581,315. In the event the obligation to make Kicker Payments continues beyond 2024, each year's gross revenue shall be increased by 3.5% so that the benchmark for 2025 shall be $16,126,661. Actual gross sales shall be determined based on Reorganized Debtor's tax returns for each year. Kicker Payments may be made through 12 equal monthly payments commencing the month following the filing of Reorganized Debtor's tax returns for each applicable year.

> 3.4.4    The Class IV Claims of Jebco and of Beatrice P. Ryan are subordinated to the other Class IV Claims for purposes of distributions under this Section 3.4 only.

> 3.4.5    All Avoidance Actions (other than Avoidance Actions challenging Security Interests and Liens) against Holders of Class IV Claims, if any, shall be waived and shall not survive the Effective Date.

> 3.4.6    Debtor Trust shall use all proceeds from the distributions by Reorganized Debtor first to pay the Debtor Trust's post-Effective Date costs and fees, including Professional fees, incurred after the Effective Date and shall promptly distribute the remainder of the distributions to Class IV Claim Holders on a Pro Rata basis. The Debtor Trust may develop rules and procedures for the holdback of any distributions pending resolution of any Claim objections filed by the Debtor Trust or Reorganized Debtor.

> 3.4.7    To secure Reorganized Debtor's obligations to the Debtor Trust, the Reorganized Debtor hereby grants a junior security interest to the Debtor's Trust on all Reorganized Debtor's assets. This security interest is expressly subordinate to Chemical Bank's Class I Claims and all other Allowed Secured Claims. The Debtor Trust shall promptly on demand take all action necessary to subordinate this security interest to any future refinancing or non-insider lender to Reorganized Debtor, and shall release the security interest to the extent necessary to facilitate any asset sale by Reorganized Debtor or any refinancing required or permitted by this Plan. If such actions are not promptly taken by Debtor's Trust, Reorganized Debtor or Chemical Bank may take such actions on behalf of Debtor's Trust. In no event will Debtor Trust use the security interest to interfere with or obstruct in any way the enforcement of Chemical Bank's rights under this Plan.

> 3.4.8    **This Class is Impaired.**

3.5    **Class V**: This Class consists of the Claims of Interests of Debtor held by Mr. Ryan, the sole Class V Interest Holder.

> 3.5.1    The Interests of this Class will be treated in one of two alternative methods:

> A.    If Class IV votes to accept the Plan:

>> i.    The Interests of Debtor will be canceled and the Interests of the Reorganized Debtor will be issued to Class V Interest Holder. Reorganized Debtor shall be a newly formed company formed as of the Effective Date and shall have an exclusive and perpetual license to use the name Fourteenth Avenue Cartage Company, Inc.

ii. In exchange for the shares, the Class V Interest Holder shall cause Jebco to provide rent to Reorganized Debtor at rates substantially below market rates. Debtor estimates market rate for the Jebco property used by Debtor to be approximately $12,000 to $14,500 per month (based on triple net rent before utilities, taxes, maintenance, etc.), and Class V Interest Holder shall cause Jebco to lease the Jebco Property to Debtor at $2,569 per month during the three-year Payment Period.

**This Class will not be Impaired.**

B. If Class IV votes to reject the Plan, and the Court determines that as a result of such rejection, the Plan, but for this paragraph does not comply with the absolute priority rule, the Interests of Debtor will be canceled and the Interests of the Reorganized Debtor will be sold at the Equity Auction set forth in Section 4.6. The proceeds of the Equity Auction will be paid, as further set forth in Section 4.6, Pro Rata first on account of Administrative Claims, next to Priority Claims, and finally to prepayment of Class I Claims. The successful Purchaser and any individual that owns or controls the Purchaser ("Owner"), must apply all revenues of the Reorganized Debtor to satisfy all of the obligations of the Reorganized Debtor as and when set forth in this Plan (including payments of all operating expenses substantially as set forth in the projections attached as an Exhibit to the Disclosure Statement), and the Purchaser and its Owner shall take no draws or equity distributions until all obligations under this Plan have been fulfilled by Reorganized Debtor. **This Class will be Impaired.**

## ARTICLE IV
## EXECUTION AND IMPLEMENTATION OF THE PLAN

4.1 Upon the Effective Date, Debtor will become the Reorganized Debtor. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtor shall continue operating Debtor's business, shall collect all revenues and income, and shall distribute such revenues and income as provided under the terms of this Plan. During the Payment Period, the Reorganized Debtor shall retain Mr. James Ryan as its President, Chief Executive Officer and sole director. Mr. Ryan shall be entitled to appoint any other officers in his sole discretion. The Reorganized Debtor may retain other employees, including Insiders, at commercially reasonable rates of compensation as more fully described in the Disclosure Statement. All Causes of Action, including Avoidance Actions seeking to avoid a Security Interest or Lien shall vest with Reorganized Debtor. All other Avoidance Actions shall be waived upon the Effective Date in accordance with Debtor's agreements with the Committee.

4.2 Upon the Effective Date, Debtor and the Committee will cause the formation of the Debtor Trust. The Debtor Trust will be controlled by a Professional person appointed by the Committee and approved by the Court. The Debtor Trust shall receive Class IV distributions from the Reorganized Debtor and shall have the right to object to any Claims. All Avoidance Actions, other than actions seeking to avoid Security Interests or Liens which shall vest in the Reorganized Debtor, shall vest in the Debtor Trust and the Debtor Trust shall have the exclusive right to pursue such Avoidance Actions. The Debtor Trust may, in its sole discretion, elect to waive all Avoidance Actions. If the Debtor Trust does not seek to waive Avoidance Actions, Reorganized Debtor will appoint a Professional person to evaluate and, if appropriate, pursue Avoidance Actions against members of the Committee for the benefit of Class IV Claim Holders. In the event that this Case

remains open for more than thirty days after the Effective Date upon the request of the Committee or the Debtor Trust or for the purpose of permitting the Committee or Debtor Trust to commence of continue Claims objections, the Debtor Trust shall be responsible for all U.S. Trustee fees resulting from this Case not being promptly closed.

4.3     No later than fourteen days before the Confirmation Date, the Committee shall File a proposed trust agreement for the Debtor Trust. If no objections are Filed before the Confirmation Date, the trust agreement shall be adopted and made a part of this Plan. If objections are filed and not overruled, the Court shall determine the provisions of the trust agreement or procedures for resolution of the dispute regarding the trust agreement.

4.4     **Assumption of Liability**:

4.4.1     Reorganized Debtor shall be responsible for satisfying the Allowed Class I, II, and III Claims and for funding the Debtor Trust in accordance with the terms and provisions of this Plan. Debtor Trust shall be responsible for satisfying the Allowed Class IV Claims in accordance with the terms and provisions of this Plan.

4.4.2     The Reorganized Debtor will retain control of and be responsible for all of Debtor's operations after the Effective Date. Funding for the operations of Debtor's business and for distributions required under this Plan during the Payment Period shall be from the operation of Debtor's business, except as otherwise set forth in this Plan.

4.4.3     Any provision of this Plan that provides rights to the Debtor to object or to have standing shall also provide the Reorganized Debtor with the right to object or have standing on all issues.

4.4.4     Debtor reasonably believes that future operations will enable the Reorganized Debtor to satisfy its obligations under the Plan. Other sources of cash may be explored and utilized by the Reorganized Debtor to the extent that such infusions are necessary or helpful to meet the obligations of the Plan or to facilitate continued operations, which may include exit financing, subordinated financing, capital contributions and/or lending from Insiders to Reorganized Debtor. Reorganized Debtor shall be entitled to enter into financing arrangements and to execute financing documents after the Effective Date without providing notice or obtaining Bankruptcy Court approval. Any financing that becomes effective before the Effective Date will be subject to Bankruptcy Court approval after notice and opportunity for a hearing. Notwithstanding the above, until all payments required by this Plan have been made in full, the Reorganized Debtor shall not agree to pay interest to any Insider or affiliate of Debtor for any loan or contribution, the Reorganized Debtor shall make no payments to any Insider or Affiliate at any time when the Reorganized Debtor is in default under any provision of this Plan, and the Reorganized Debtor shall not provide loans or contributions to any Insider or Affiliate. Nothing in this section or the Plan permits Debtor or Reorganized Debtor to grant any Liens on property that is encumbered by Liens or security interests in favor of Chemical Bank, unless such Liens or security interests are expressly subordinate to the Liens or security interests in favor of Chemical Bank, Chemical Bank consents in writing, or unless the Claims are paid in full as a result of the financing.

4.4.5     The Reorganized Debtor may pre-pay any Claim, other than Claims held by Insiders or Affiliates (which may only be pre-paid after all other Plan payments have been made in full), at any time without penalty or liability for unmatured interest. The Reorganized Debtor may negotiate discounts in exchange for pre-payments, including with the Debtor Trust. Upon payment by the Reorganized Debtor to any Claim Holder or to the Debtor Trust in the amounts required under this Plan or as otherwise agreed by the Claim Holder or Debtor Trust, the Reorganized

Debtor will have no further obligation to the Claim Holder or Debtor Trust under this Plan, and the Claim Holder will have no further or continued rights or standing under this Plan.

4.4.6    Upon satisfaction of all obligations to all Claim Holders, the Reorganized Debtor will no longer be bound by the provisions of this Plan and will be entitled to conduct its business without Bankruptcy Court supervision under applicable non-bankruptcy law. Nothing in this Section shall be construed as waiving or limiting the Reorganized Debtor's rights and interests under this Plan, to enforce those rights and interests through the Bankruptcy Court, to dispute claims, to bring motions or pursue Causes of Action in the Bankruptcy Court or any other court, or to petition the Bankruptcy Court for the redress of any grievances.

4.4.7    Upon the Effective Date, the Committee will disband and will have no further standing in this Case, except with respect to any appeal of the Confirmation Order. The Debtor Trust will replace the Committee in any litigation or contested matter pending as of the Effective Date. Upon final distribution of funds to the Class IV Claim Holders, the Debtor Trust shall wind-up and dissolve. The Debtor Trust may withhold sufficient funds from the last distribution to pay any appropriate fees and expenses involved in winding-up and dissolving, including the filing of any necessary papers.

4.5    **Professional Fees:**    Any services performed or expenses incurred by any Professional on behalf of Debtor with respect to the Chapter 11 Case before the Effective Date, will be Administrative Claims, will be paid by Reorganized Debtor as set forth in Article II and will be subject to the prior review and approval of the Bankruptcy Court. Any services performed or expenses incurred by any Professional on behalf of Debtor Trust or the Reorganized Debtor with respect to the Chapter 11 Case after the Effective Date will be an obligation of the Debtor Trust or Reorganized Debtor, respectively, and will not be subject to the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Bankruptcy Rule 2016, after the Effective Date, no Professional will be required to disclose payments from Debtor Trust or Reorganized Debtor to the Bankruptcy Court or the United States Trustee. All fees and expenses of Debtor Trust and Reorganized Debtor shall be billed directly to Debtor Trust or Reorganized Debtor, respectively, and the Bankruptcy Court shall review only that portion to which Debtor Trust or Reorganized Debtor objects. Debtor Trust or Reorganized Debtor must pay the portion not objected to in accordance with the terms of the invoice.

4.6    **Effectuating Documents**:  With the exception of the liens of Chemical Bank, Mr. James Ryan is authorized to execute, deliver, file, or record such financing statements, contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary or appropriate on behalf of Debtor to effectuate and further evidence the terms and conditions of this Plan without further notice to or order, action or approval of the Bankruptcy Court.

4.7    **Preservation of Rights of Action**:

4.7.1    **Vesting of Causes of Action:** In accordance with section 1123(b) of the Bankruptcy Code, all Causes of Action of Debtor and Debtor's Estate will be transferred to and vest with the Reorganized Debtor, except that Avoidance Actions (other than avoidance of Security Interests or Liens) are waived and shall not be brought by any entity. The Reorganized Debtor shall retain and may (but is not required to) enforce all rights to commence, pursue, compromise and collect, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, collection of trade debt and account

payables, Avoidance Claims seeking to avoid a Security Interest or Lien and any actions specifically listed in the Disclosure Statement.

4.7.2 **All Causes of Action and Avoidance Actions not waived under this Plan are Specifically Reserved, whether or not specifically listed in the Plan or Disclosure Statement:** Unless any Causes of Action against a Person, including (but not limited to) actions to collect trade payables and other debts, actions against any person for violation of the automatic stay, Avoidance Actions, and any other prepetition or post-petition action held by Debtor, are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, Exhibit, or a Final Order, Reorganized Debtor specifically reserves all Causes of Action for later adjudication in the Bankruptcy Court or in a state or federal court with jurisdiction, and, no preclusion doctrine, res judicata, estoppel (judicial, equitable or otherwise) or laches will apply to any of the Causes of Action upon, after or as a consequence of the Confirmation, entry of Confirmation Order, or the Effective Date.

4.8 **The Equity Auction:**

4.8.1 If Class IV votes to reject the Plan, the equity Interests in the Reorganized Debtor shall be sold to the highest bidder at the Equity Auction. Any person may bid at the Equity Auction but must show its financial ability to meet all requirements of the Reorganized Debtor under this Plan to be qualified to bid. Class V Interest Holders are automatically qualified bidders. The Purchaser and any individual that owns or controls the Purchaser ("owner") will be bound by this Plan to use all revenues of Debtor make all payments required under this Plan and to perform all other obligations of the Reorganized Debtor before taking any draw or equity distribution. If there are no bids at the Equity Auction, the new Interests in the Reorganized Debtor will be granted as set forth in section 3.5.1(A).

4.8.2 If the Equity Auction occurs, Debtor shall sell the equity Interests in Reorganized Debtor in accordance with the following procedures:

A. Debtor shall schedule an auction sale (the "Equity Auction") at 9:00 a.m. no earlier than four weeks following the Confirmation Date, or the first business day thereafter. The Equity Auction shall be held at the office of Debtor's counsel. Any party interested in attending and/or bidding at the Equity Auction may obtain additional details regarding the time, place and process of the Equity Auction by contacting Debtor's counsel.

B. In addition to notice provided by dissemination of this Plan to all Debtor's creditors, Debtor shall (i) on the first business day after the Confirmation Date file a notice of the Equity Auction with the Bankruptcy Court with the case caption and indicating the date and time of the Equity Auction and (ii) cause the notice to be published as a legal notice with a paper with general distribution in the Detroit area for two consecutive weeks commencing on the week after the Confirmation Date providing the name of the Debtor, a description of Debtor's business including gross revenues for the preceding six months, the Bankruptcy Case number and contact information for Debtor's counsel and Committee's counsel. This Section shall be deemed sufficient notice of the Equity Auction and no further or additional notice shall be required. Notwithstanding the foregoing, the Committee may take additional actions to market the Debtor's assets as deemed advisable by the Committee.

C. All bidders must agree to comply with all the terms and provisions of this Plan, including (but not limited to) the provisions of this Section and Section 3.4.1(B). The opening bid at the Equity Auction shall be the Class V Equity Holder's offer under Section 3.5.1(A) to provide rent for the Jebco Property at rates substantially below market rates for a five-year period, which Debtor estimates to have a value of at least $360,000. In the event of a dispute, such value may be determined by the Bankruptcy Court at an expedited hearing.

D. The Equity Auction shall be conducted by counsel for Debtor in a manner consistent with this Plan and reasonably calculated, in Debtor's sole discretion, to obtain the highest and best sale price. Each bidder must demonstrate its ability to immediately fund the amount of the winning bid, and must pay the amount of the winning bid within twenty-four hours of submitting the winning bid. If the winning bidder fails to timely pay the amount of the winning bid, the next highest bidder will have two full Business Days after notice to pay the amount of its highest bid at the Equity Auction and to become the successful bidder.

4.8.3   The Reorganized Debtor shall pay all proceeds of the Equity Auction as set forth in section 3.4.1(B).

## ARTICLE V
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

5.1     **Discharge of Indebtedness**:

5.1.1     Except as otherwise provided in this Plan, the confirmation of this Plan will, and does hereby act to discharge and release the Claims of all Creditors against Debtor and the Reorganized Debtor, the same constituting a full, total and complete settlement with the Creditors. Confirmation will also act as a merger and relinquishment of any and all Claims that Creditors have, or may have, against Debtor and the Reorganized Debtor as provided in the treatment of the Creditors. Payment in full of an Allowed Secured Claim under this Plan shall also discharge such Claim Holder's claims against any joint obligor or guarantor. Partial payment of any Claim under this Plan shall also be accounted as partial payment of any Claim Holder's claim against any joint obligor or guarantor. The forgoing notwithstanding, this paragraph will not affect the rights of any taxing authority against any other entity or person who may be liable or responsible for the taxes of the Reorganized Debtor, except to the extent that it provides such other person a defense that the claims of the taxing authority have been actually paid in whole or in part.

5.2     **Subordinated Claims**.  The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and confirm the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, Debtor reserves the right to re-classify (or request that the Bankruptcy Court re-classify) any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. If a Claim is Allowed but subordinated, the Claim will not be entitled to payment under this Plan until all other Claims have been paid in full or as otherwise specified by the Bankruptcy Court.

5.3    **Injunction**.  Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all individuals and entities that have held, currently hold, or may hold Claims or Interests against Debtor, or that are claiming by or through any such individual or entity, are permanently enjoined from taking any of the following actions against Debtor, Reorganized Debtor, Debtor Trust or their respective property on account of any such Claims, debts, liabilities, or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or right of recoupment of any kind against any debt, liability, or obligation due to Debtor, Reorganized Debtor or Debtor Trust, whether such debt accrued before or after the Petition Date; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is inconsistent, with the provisions of this Plan.

5.4    **Protections against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against Debtor, Reorganized Debtor or Debtor Trust, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, Debtor, Reorganized Debtor or Debtor Trust, or other Person with whom Debtor has been associated, solely because Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

5.5    **Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Articles II and III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate will be deemed fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to Debtor and its successors and assigns. To the extent that this Plan provides that Creditors will retain Security Interests or Liens, such Security Interests and Liens will be deemed fully released and discharged upon full performance of all obligations under this Plan to the Holder of such Security Interest or Lien. With the exception of the liens of Chemical Bank, Reorganized Debtor and Debtor Trust are authorized to file any releases, waivers, financing statement terminations, or other documents appropriate to effect the provisions of this Section.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTION

6.1    No Interest On Unsecured Claims. Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any General Unsecured Claim.

6.2    Delivery Of Distributions in General. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Class I, II and III Claims and Allowed Interests will be made by Reorganized Debtor, and distributions to Class IV creditors will be made by the Debtor Trust from funds received by Reorganized Debtor and from Avoidance Actions, if any. All distributions will be made (a) at the addresses set forth on the Proofs of Claim Filed by the Holders of Claims or Interests (or at the last known

addresses of such Holders of Claims or Interests if no Proof of Claim is Filed or if Debtor has been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to Debtor after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and Debtor has not received a written notice of a change of address, or (d) at the address of any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. Distributions under the Plan on account of Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

6.3 **Undeliverable Distributions and Non-Negotiated Checks.** If any distribution to a Holder of a Claim or Interest is returned as undeliverable, no further distributions to such Holder of such Claim or Interest will be made unless and until Reorganized Debtor or Debtor Trust (as appropriate) is notified of the then-current address of such Holder of the Claim, at which time all missed distributions will be made to the Holder of the Claim without interest. If checks issued by the Reorganized Debtor or Debtor Trust on account of Claims are not negotiated within ninety days after the issuance of the check, the check may be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks will be held by the Reorganized Debtor or Debtor Trust until the earlier of (i) such distributions are claimed by the valid Holder of the Claim or (ii) ninety days after the check is returned or voided due to non-negotiation, after which date all such undistributed and non-negotiated amounts will revert to the Reorganized Debtor or Debtor Trust free of any restrictions and the Claim of any Holder or successor to such Holder with respect to the distribution will be deemed discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein requires the Reorganized Debtor or Debtor Trust to attempt to locate any Holder of an Allowed Claim.

6.4 **Fractional Payments.** Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars are not required. Payment of fractions of dollars that would otherwise be distributed under the Plan will be rounded to the lower whole number of dollars.

6.5 **Restrictions on Distributions.** Notwithstanding anything in this Plan to the contrary, Debtor Trust is not required to make any distribution to a Claim Holder in an amount less than $10.00.

**ARTICLE VII**
**MODIFICATION OF THE PLAN**

7.1 **Modification of Plan**. Except as otherwise provided in this Plan, Debtor may, from time to time, propose amendments or modifications to this Plan prior to the Confirmation Date, without leave of the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modification set forth in the Plan, Debtor expressly reserves its rights to revoke or withdraw, or to alter, amend or materially modify the Plan, one or more times before the Confirmation Date. After the Confirmation Date, Debtor, Reorganized Debtor or Debtor Trust may, with leave of the Bankruptcy Court and upon notice and opportunity for hearing to the affected Creditor(s), remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or otherwise modify the Plan.

7.2 **Effect of Confirmation on Modifications**. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

7.3 **Revocation or Withdrawal of the Plan.** Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If Debtor revokes or withdraws the Plan, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by Debtor or any other Person.

## ARTICLE VIII
## JURISDICTION OF THE COURT

8.1 **Jurisdiction**. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including without limitation, jurisdiction with respect to:

8.1.1 The classification of the Claim of any Creditor and the re-examination of Claims Allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors. The failure by Debtor to object to, or to examine any Claim for the purposes of voting, will not be deemed to be a waiver of any right to object to, or reexamine the Claim, in whole or in part. Furthermore, the fact that this Plan has provided a treatment for the benefit of a particular Creditor will not in any way be deemed to be a waiver of any right to object to or re-examine the Claim or any secured interest whether by mortgage or otherwise which secures such Claim, in whole or in part.

8.1.2 The determination of all questions and disputes regarding title to the assets of the estate, and all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between Debtor and any other party.

8.1.3 The correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

8.1.4 The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan.

8.1.5 The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of Debtor, Reorganized Debtor and Debtor Trust or any party-in-interest, and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary.

8.1.6   The review and approval of all Professional Fee applications for services rendered before the Confirmation Date and the review of any Professional Fees for services rendered in connection with the Plan after the Confirmation Date to the extent that Debtor disputes all or a portion thereof.

8.1.7   Debtor's, Debtor Trust's and Reorganized Debtor's right to pursue any Avoidance Actions.

8.1.8   The entry of an order determining the validity of any Lien.

8.1.9   The entry of an order concluding and terminating this Case.

## ARTICLE IX
## TITLE TO PROPERTY

9.1.   **Revesting of Assets**.  Except as otherwise explicitly provided for in this Plan, on the Effective Date, all property held by the Estate (including all Causes of Action) will vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, encumbrances, right, and Interests of Creditors and equity security Holders. As of and following the Effective Date, the Reorganized Debtor, as provided for under the terms of this Plan, may operate Debtor's business and use, acquire, and dispose of property and settle and compromise Claims or Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order. All Avoidance Actions, other than actions seeking to avoid a security interest or Lien, shall vest in the Debtor's Trust and Debtor's Trust may waive all Avoidance Actions or pursue, settle and compromise any or all Avoidance Actions free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, except as expressly set forth in this Plan.

9.2.   **Effect of Conversion**. In the event of a conversion of this case to a Chapter 7 proceeding, all property of the Debtor, Debtor Trust or Reorganized Debtor, including property which will revest in the Reorganized Debtor or Debtor Trust pursuant to Confirmation of this Plan and all property acquired by the Reorganized Debtor or Debtor Trust subsequent to a plan of confirmation, shall be property of the Chapter 7 estate, subject to the Liens and security interests granted under this Plan.

## ARTICLE X
## UNITED STATES TRUSTEE FEES & REGULATORY COMPLIANCE

10.1   **Payment of U.S. Trustee Fees**.  Reorganized Debtor shall pay to the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), and shall provide the United States Trustee with appropriate reports indicating the cash disbursements for the relevant period until such time as the Chapter 11 Case is administratively closed. Reorganized Debtor may charge such payments to the Debtor Trust by withholding an equal amount of distributions if Debtor Trust is responsible for payments to the United States Trustee under the circumstances set forth in Section 4.2.

## ARTICLE XI
## EXECUTORY CONTRACTS

11.1   **Rejection of Executory Contracts and Unexpired Leases.**  All executory contracts and unexpired leases of Debtor shall be deemed rejected except: all contracts and

leases that are (i) specifically assumed in this Section, (ii) subject to a separate motion to assume listed in Debtor's Schedules and Section 11.3 applies. In addition to the contracts and leases to be assumed under Section 11.2, Debtor assumes, as of the Effective Date all executory contracts with FCA US LLC, with no cure payment.

11.2 **Cure Claims.** No later than twenty-one days before the Confirmation Date, Debtor shall File and send a notice to all known executory contract and unexpired lease Holders that are counter-parties to contract or leases that Debtor or Reorganized Debtor intends to assume. The notice will include the Debtor's proposed cure amount and any proposed cure terms of payment. If the counter-party agrees to the notice or fails to File an objection within fourteen days after service, the executory contract or unexpired lease shall be assumed pursuant to the terms and cure amount stated in the notice, and the cure amount shall be paid in accordance with the notice and this Plan. If an objection is timely Filed, the objection shall trigger a cure amount dispute. The parties shall confer in good faith to resolve the cure amount dispute but if the dispute is not resolved, either party may file a request for a hearing with the Court. During the pendency of a cure amount dispute the automatic stay with respect to the contract or lease will remain in effect notwithstanding the occurrence of the Effective Date. Debtor or Reorganized Debtor may, at any time before or within five days after final resolution of a cure amount dispute, reject a contract or lease by Filing an appropriate motion with the Court (and the contract or lease shall be rejected as of the Filing date). If the contract or lease is not rejected within five days after final resolution of a cure amount dispute, the contract or lease shall be deemed assumed and Reorganized shall promptly pay the cure amount unless otherwise agreed by the contract or lease counter-party.

11.3 If Debtor has not listed an executory contract or unexpired lease in Debtor's Schedules and, at any time within 90-days after the Effective Date (but before administrative closing of the Case) Reorganized Debtor determines that it would be beneficial to assume such contract or lease, Reorganized Debtor may file a motion to assume the contract or lease along with a proposed cure amount, and shall be entitled to assume the contract or lease on the terms set forth in the Motion if no objection is Filed within fourteen days after service. If an objection is timely filed, the cure amount dispute provisions of section 11.2 shall apply.

11.4 Any Creditor who (a) has a Claim as a result of the rejection of a contract shall have until thirty days after the Effective Date to file a Proof of Claim asserting the rejection damages relating to the contract, failing which such Claim will be disallowed in its entirety. However, if the Creditor has not been served with a copy of this Plan, the Creditor shall have thirty days from receipt of actual or constructive notice of Debtor's rejection of the contract.

11.5 **Objections to Rejection Claims.** Debtor Trust or Reorganized Debtor may file an objection to any Proof of Claim filed in accordance with this Article and in accordance with Article XII within the later of the time permitted under Article XII or sixty days after receipt of the claim.

## ARTICLE XII
## OBJECTIONS TO CLAIMS

12.1. **Timing of Objections:** Debtor Trust or Reorganized Debtor may object to the allowance of any Claim, whether listed on the Schedules filed by Debtor, or filed by any Creditor, on or before the later of (a) sixty days from the date of filing of any Proof of Claim or (b) six months after the Effective Date.

12.2 **Objections to Liens:** Reorganized Debtor may object to any Lien or security interest within the time period set forth in Section 12.1 or after any attempt by a Creditor to enforce

the Lien, except that Reorganized Debtor may not file an objection to any Lien that is the basis of a Claim Allowed under the terms of this Plan.

12.3 **Claims Bar Date**: Except as provided herein or otherwise agreed in writing by Reorganized Debtor (with respect to Class I, II and III Claims) or Debtor Trust (with respect to Class IV Claims), any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date (or, for a Claims Bar Date after the Effective Date, as of the applicable Claims Bar Date) without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Date such late Claim has been held timely Filed by a Final Order.

12.4 **Allowance of Clams – No Preclusion**: The allowance of any Claim, either after the Filing of an objection or as a result of no objection having been Filed, shall in no event create any estoppel argument against Reorganized Debtor or any other party, whether or not affiliated with Reorganized Debtor. This provision shall be given a broad interpretation and shall, without limitation, prohibit the use of any argument of res judicata, collateral estoppel, claim preclusion, issue preclusion, or judicial estoppel in the event of any current or future litigation between Reorganized Debtor, an affiliate of Reorganized Debtor, the Debtor Trust or any other Person with the Clam Holder as a result of allowance of a Claim or the absence or resolution of any objection, with the sole exception that the allowance of the Claim sets the amount of the Claim as against the Reorganized Debtor for purposes of this Plan and distributions under this Plan. The foregoing section is not applicable to Class I Claims, which have been Allowed pursuant to agreement of Debtor and the Class I Claim Holder.

### ARTICLE XIII
### MISCELLANEOUS PROVISIONS

13.1 **Immediate Binding Effect**. Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Debtor, Debtor Trust, Reorganized Debtor and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or is deemed to accept or reject the Plan), and all Persons that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan.

13.2 **Additional Documents**. On or before the Effective Date, Debtor may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Debtor, Reorganized Debtor, Debtor Trust and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.3 **Reservation of Rights**. Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by Debtor with respect to the Plan or the Disclosure Statement shall be, or shall be deemed to be, an admission or waiver of any rights of Debtor with respect to the Holders of Claims or Interests before the Effective Date.

13.4     **Successors and Assigns**. The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

13.5     **Service of Documents.**  After the Effective Date, any pleading, Notice, or other document required by the Plan to be served on or delivered to Debtor or Reorganized Debtor must be sent by overnight mail, postage prepaid to:

Fourteenth Avenue Cartage, Inc.
c/o James Ryan
4401 Stecker
Dearborn, MI  48126

*with a copy to:*

Michael R. Wernette
**WERNETTE HEILMAN PLLC**
40900 Woodward Ave., Ste. 111
Bloomfield Hills, MI  48304

Notice to the Debtor Trust must be made on the representative of the Debtor Trust, with a copy to the Debtor Trust's counsel, which will be made available through an appropriate Filing with the Bankruptcy Court by the Debtor Trust promptly after the Effective Date.

13.6     **Entire Agreement.** Except as otherwise stated in this Plan, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.7     **Nonseverability of Plan Provisions**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without Debtor's consent; and (3) nonseverable and mutually dependent.

13.8     **Closing of Chapter 11 Case**.  Debtor Trust shall, after the full administration of the Chapter 11 Case, File with the Bankruptcy Court, all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

13.9     **Waiver or Estoppel**. Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with Debtor, Debtor's counsel, or any other Person, if such

agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

      13.10  **Conflicts and Interpretation of the Plan**. Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, or any other order (other than the Confirmation Order) referenced in the Plan (or any Exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan will govern and control.

      13.11  **Termination of Liens and Encumbrances**.  Debtor and all parties-in-interest, including any Creditor, must execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan. This includes the execution by Creditors of any Uniform Commercial Code termination and mortgage releases and termination. Debtor is expressly authorized to file any termination statement to release a Lien which is either discharged or satisfied as a result of this Plan or any payments made in accordance with the Plan after ten business days' notice to the affected Creditor.

      13.12  **Limitations on Operations**.  If the Reorganized Debtor has made all payments and distributions required under this Plan, all restrictions, negative covenants, and other limitations on Debtor's operations provided herein or in the Confirmation Order will terminate.

      13.13  **Causes of Action; Standing**.  Except as otherwise provided in this Plan, Debtor has the right and authority to commence, continue, amend or compromise all Causes of Action available to Debtor, the Estate or the debtor-in-possession, including without limitation all Avoidance Claims whether or not those Causes of Action or Avoidance Claims were the subject of a suit as of the Confirmation Date.

<u>**AMENDED DISCLOSURE STATEMENT**</u>

**I.**     <u>**Introduction and Overview.**</u>

      A.     *Purpose of Disclosure Statement.*

      All capitalized terms unless the term is defined in this Disclosure Statement have the meaning given in Debtor's Plan of Reorganization (the "<u>Plan</u>").

      Debtor submits this Disclosure Statement ("<u>Disclosure Statement</u>") pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, to all known Holders of a Claim against it. Debtor has filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, a copy of which accompanies this Disclosure Statement.

      Debtor provides this Disclosure Statement to its Creditors to disclose information material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote to accept of the Plan.

      B.     *Source of Information.*

      The Disclosure Statement and the Plan have been prepared from information furnished primarily by Debtor. Debtor's professionals have not conducted an independent investigation to verify this information.

      Certain materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While every effort has been made to retain the meaning of these documents or portions of documents that have been summarized, Debtor urges you to thoroughly review the contents of these documents before relying on them. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of the document will govern.

      The statements contained in this Disclosure Statement are made as of its date, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights in connection with it will, under any circumstances, create an implication that there has been no change of the facts set forth in this Disclosure Statement since the date it was first filed.

      C.     *Overview of Chapter 11.*

      Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting a rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

      The consummation of a plan of reorganization is the principal objective in a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court

1

makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to limited exceptions, the confirmation order discharges a debtor from any debt that arose before the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

## II.     Exhibits to this Disclosure Statement.

The following Exhibits are incorporated into and are a part of this Plan and Disclosure

Statement as set forth in Section 1.6 of the Plan.

A.     Liquidation Analysis

B.     Financial Information for Three Years Before the Petition Date

C.     Summary of Monthly Operating Reports Filed in this Chapter 11 Case

D.     Projections for the Five-Year Payment Period Proposed in the Plan

## III.     Description of Debtor.[1]

A.     *Describe the Debtor.* Debtor is a Michigan corporation that has provide intermodal, truck load, and cross-border deliveries across Michigan, Ohio, Ontario, Indiana, Illinois and Wisconsin for over 100 years. Located in Dearborn, Michigan, Debtor operates a fleet of tractors and trailers. Debtor holds Michigan Intrastate and Contract Authorities, U.S.ICC 48 Slate Common and Contract Authorities, and Ontario General Freight Permits and is a Customs Bonded Freight Station with a Customs Bonded Protected Yard.

Debtor operates on a 12.5 acre site owned by Jebco, an affiliated company under common ownership with Debtor. The Jebco Property consists of a 22,000 sq. ft. terminal with a 26-door docking area, 10,000 sq. ft. maintenance facility and a 5-acre container and trailer storage lot – all fenced, lit and fully secured.

Debtor is reorganizing through Chapter 11 and will continue to operate its business in a new corporate form as Fourteenth Avenue Cartage, Inc. Upon the Effective Date after confirmation of the Plan, Debtor will become the Debtor Trust for the benefit of Class IV General Unsecured Claim Holders.

---

[1] If Disclosure Statement conflicts with any Plan terms, the Plan terms govern.

B.    *Description of the principals.*

1.    *Background.*

James Ryan is the Chief Operating Officer and has taken over as acting President as of the Petition Date. He was Operations Manager of the Debtor for over 20 years. After a nine-month hiatus, Mr. Ryan returned as Operations Manager then took over the ownership of the Debtor shortly before the Chapter 11 bankruptcy filing. Mr. Ryan began working for Debtor at the age of 19, forty years ago.

Mr. Rappa has been working at Debtor as controller for more than 20 years. He is also head of human resources, handles payroll, accounts payable and accounts receivable and general bookkeeping duties. Mr. Rappa is Mr. Ryan's brother.

2.    *Compensation.*

In the current year both before and during the pendency of the bankruptcy case, Mr. Ryan and Mr. Rappa have received compensation of approximately $2,000 per week plus health benefits and reimbursements for company related expenses. Debtor anticipates that it will continue compensating Mr. Ryan and Mr. Rappa at the same rates and on the same terms with standard cost of living increases in line with inflation. Debtor also continues to pay health care benefits for Beatrice Ryan, Debtor's former Chief Executive Officer, and anticipates continuing to do so. Further information on employee compensation, including Insider compensation, can be found in Debtor's First Day Motion for an Order Authorizing Debtor to Pay Pre-petition Payroll Obligations [DN 6].

3.    *Their legal relationships with Debtor.*

a.    Debtor anticipates that the following Creditors may assert guaranties by Beatrice Ryan, the mother of Mr. Ryan and the former President of Debtor, the Beatrice P. Ryan Trust, the James E. Ryan Trust [James E. Ryan is Mr. Ryan's deceased father] and/or Jebco: Chemical Bank, Penske, Wells Fargo Equipment Finance, Inc, InLand Finance Company, Compass Lease, LLC, and General Electric Capital Corp. Further, Trailer X-Press, Inc. may assert a guaranty by Mr. Ryan, and InLand Finance Company may assert a guaranty by Mr. Rappa. More detailed information on Insider guaranties can be found on Debtor's Schedule H [DN 34].

b.    As stated above, Mr. Ryan also owns Jebco. Jebco leases the Jebco Property to Debtor under a verbal lease and is a co-obligor on each of Debtor's four loans with Chemical Bank. Jebco asserts a $51,912.27 claim against Debtor. Debtor anticipates entering into a written lease with Jebco before the Effective Date consistent with the terms of the Plan and attached projections subject to (i) Bankruptcy Court approval and (ii) ownership of Reorganized Debtor by Mr. Ryan after the Effective Date. As Debtor is not assuming the Jebco lease but entering into a new lease, Debtor will not incur a cure cost with Jebco and Debtor anticipates that Jebco will agree to the subordination of its pre-petition claim as part of the new lesae.

3

C.    *The Debtor's business and the causes for the Chapter 11 filings.*

Debtor is a trucking and logistics company providing intermodal, truck load, and cross-border deliveries across Michigan, Ohio, Ontario, Indiana, Illinois and Wisconsin. Debtor also provides trailer storage services. Debtor's primary customer is FAC US LLC, although Debtor also provides intermodal services to a number of other customers. Debtor has been a family business for over twenty years. However, after the passing of Mr. James E. Ryan, control of the Debtor passed among a number of family members and the resulting disparate management styles and multiple changes resulted in less favorable business deals, loss of business, and, ultimately, cash flow and liquidity problems. These liquidity problems, in turn, resulted in failure to make timely payments to certain creditors and the loss of a number of trailers. Further, Debtor had not raised its pricing for many years, resulting in much of Debtor's becoming unprofitable. These factors all combined to push Debtor further and further into financial crisis. The immediate precipitating cause of Debtor's bankruptcy filing was the filing of garnishments by Wells Fargo Equipment Finance, Inc. against Debtor's bank account and Debtor's receivables owed by FCA US. This action completely froze Debtor's cash availability and forced Debtor to file this Chapter 11 bankruptcy case.

## IV.    **Post-petition events of significance.**

A.    *Post-petition transfers outside of the ordinary course of business.*

There have been no post-petition transfers outside of the ordinary course of business during this case, except as authorized by the Bankruptcy Court.

B.    *Summaries of the important details of cash collateral, post-petition financing and adequate protection orders.*

i.    On the Petition Date, the Debtor filed an Emergency Motion to Use Cash Collateral [DN 5]. Because the Debtor receives daily deliveries of fuel and uses drivers provided by outside driver services, Debtor required immediate use of cash collateral to keep its business open. Failure to obtain authorization to use cash collateral would have prevented Debtor from operating its trucks and making deliveries, interrupting Debtor's service to its customers who rely on timely deliveries. Debtor was able to negotiate deliveries and services during the short interim period between the bankruptcy filing and entry of the Interim Cash Collateral Order [DN 21]. A final hearing on the use of cash collateral was scheduled for March 13, 2018. After an objection by Chemical Bank was amicably resolved, a final cash collateral order was entered on November 5, 2019 [DN 50]. Notwithstanding entry of the final order, it remained subject to objection by the Committee and the cash collateral order has been continued twice [DN 124] and [DN 147], the second time through May 1, 2020, and each subject to objection by the Committee.

ii.    Concurrently with filing the cash collateral motion, Debtor also filed an emergency motion to pay wages, salaries and continue to make payments necessary for employee benefits [DN 6]. The motion was also filed on an emergency basis because the Debtor was required to make

4

payroll shortly after the filing. The Court entered an order granting Debtor's payroll motion on October 7, 2019 [DN 20].

iii. The Court appointed the Committee on October 31, 2020 [DN 41].

iv. The Court entered an order modifying the automatic stay to permit Chemical Bank to terminate a certain swap agreement on November 5, 2019 [DN 49]. Chemical Bank subsequently terminated the swap agreement.

v. On November 13, 2019, after a status conference, the Court entered an Order Establishing Deadlines and Procedures. [DN 59].

vi. The Court granted Debtor's applications to employ Wernette Heilman PLLC as its counsel and to employ Mies and Company as its financial advisor on November 18, 2098 [DN 73, 74]. The Court granted the Committee's application to employ Schafer and Weiner, PLLC as its counsel on November 20, 2019 [DN 77]. The Court also granted Debtor's and Committee's joint motion to permit limited interim payment of fees to professionals on December 4, 2019 [DN 85]. On January 22, 2020, the Court granted the Committee's application to employ Zwick & Banyai, PLLC as its accountant [DN 118].

vii. On December 13, 2019, the Case was reassigned to the current Bankruptcy Judge [DN 92].

viii. On January 31, 2020, the Court extended the time for Debtor to file a joint plan and disclosure statement [DN 126].

ix. On February 28, 2020, the Court entered a stipulated order providing DTE Energy with an adequate assurance deposit [DN 144].

x. On March 16, 2020, Debtor filed its original combined plan and disclosure statement [DN 149].

xi. On April 21, 2020, at the request of Debtor and the Committee, the Court entered its Order Discontinuing Voting Pending Plan Negotiations and Amending Dates and Deadlines Regarding Plan Confirmation (the "Discontinue Voting Order" [DN 177]. The Discontinue Voting Order, among other things, withdraws the original plan, sets a deadline for the filing of this Amended Plan, and sets new dates for the return of ballots, filing of objections, and sets a new Confirmation Hearing date.

C. *Explain any litigation during the case.*

There has been no litigation during the Chapter 11 Case.

## V.    <u>Assets and Liabilities.</u>

A.    Debtor's liquidation analyses is attached as **Exhibit A**.

B.    *Risks, conditions and assumptions regarding the stated values.*

   i.    All values stated in the Liquidation Analysis for assets, liabilities, costs, expenses and potential recoveries are based on good faith estimates using information currently available to Debtor. The estimates have not been audited. For purposes of this liquidation analysis, Debtor has used the forced sale values. All valuations are necessarily estimates and actual results may result in higher or lower recoveries.

   ii.    Unless otherwise noted, Debtor has used the liabilities set forth in the Proofs of Claims and Schedules. These amounts are subject to adjustment and objections by Debtor.

   iii.    Costs of liquidation are estimates.

   iv.    The stated values of all equipment and personal property may be subject to market fluctuations due to the recent COVID-19 crisis.

C.    *Identify all potential claims and causes of action, including claims against insiders and avoidance actions.*

   i.    Debtor is not aware of any Causes of Action other than actions to recover unpaid receivables and trade debt, and Avoidance Actions against persons and entities that received payments from Debtor before the Petition Date. The Avoidance Actions primarily involve preference or fraudulent transfer actions against vendors and suppliers that received payments from Debtor before the Petition Date. As part of negotiations with the Committee, Debtor has agreed that all Avoidance Actions are waived in the Plan except for potential claims seeking to avoid security interests or liens that may be asserted by Class II or Class III Claim Holders. Debtor (or Reorganized Debtor, as applicable) may institute actions at law or, if applicable, arbitrations against all customers, vendors, and suppliers that Debtor believes may owe debts to Debtor. Potential defendants include all customers, vendors, and suppliers listed in Debtors filed Schedules and Statement of Financial Affairs.

   iii.    Debtor has causes of action against The Capital Alliance Corporation[1] and/or its affiliates[2] arising from a prepetition relationship in which Debtor leased trailers from Capital Alliance. Debtor contends that Capital Alliance breached a legally enforceable promise when, after years of leasing trailers to Debtor, on or about April 16, 2019 Capital Alliance moved to disable and repossess hundreds of Fourteenth's leased trailers without warning; and in spite of express assurances that it was not planning to take back its trailers. Debtor's ruinous action severely damaged Debtor's operations and almost put Debtor out of

---

[1] Also d/b/a Advantage Trailer Rental Company, Advantage Trailer Resources, Advantage Transportation Equipment, and Advantage Transport Services

[2] Advantage Trailer Services, LLC, The Capital Alliance Leasing Corporation, and Advantage Integrated Trailer Resources, LLC, d/b/a/ Northwest Trailer and NW Trailer Rental.

6

business. Capital Alliance and Debtor filed competing claims against each other in a Wayne County Circuit Court action which was pending on the Petition Date and is now stayed. Debtor is still accruing damages from Capital Alliance's wrongful conduct. Debtor believes its damages may exceed $800,000.00.

    iii.    All Causes of Action shall vest with the Reorganized Debtor upon the Effective Date, and Reorganized Debtor may commence, prosecute, settle or otherwise resolve all Causes of Action in the Bankruptcy Court or any other court of competent jurisdiction without Bankruptcy Court oversight.

D.    *Information regarding guaranteed debt or persons co-liable with Debtor on any debt.*

    i.    See Schedule H and item 3.a, above for a list of entities that may claim that the Debtor is co-liable with certain Insiders.

E.    *Details on the Debtor Trust.*

    i.    Under the Plan, a Debtor Trust is to be created as of the Effective Date for the purpose of collecting and distributing payments to general unsecured creditors, monitoring and enforcing Reorganized Debtor's performance under the Plan, and with the power to negotiate with Reorganized Debtor regarding, among other things, any offer of pre-payments and resolution of any disputes regarding Reorganized Debtor's performance or amounts due under the Plan.

    ii.    The Debtor Trust will be authorized to retain professionals, and the cost of such professionals shall be paid from the distributions made by Reorganized Debtor.

    iii.    The Debtor Trust will be formed by the Committee, and the Committee will be authorized to appoint the initial trustee. Accordingly, it is appropriate for the Committee to propose a trust agreement for approval by the Bankruptcy Court, and a process for a proposed trust agreement and approval is set forth in the Plan. Reorganized Debtor anticipates this document will be filed by the Committee and any creditor or other party in interest may obtain a copy by contacting Debtor's counsel or Committee counsel, or by accessing the Court's electronic case filing system.

**VI.**    **Details regarding implementation of the Plan.**

A.    *Provide meaningful summaries of financial information in a consistent format for at least the following period:*

    i.    *Three years pre-Petition Date*

        See **Exhibit B**. Note that Debtor's 2019 Profit and Loss statement and Balance Sheet cover some post-petition months.

7

ii.     *Post-Petition Date*

See summary of monthly operating reports filed in this Chapter 11 Case attached as **Exhibit C**. The full monthly operating reports are available on the Court's docket or can be obtained at request to Debtor's counsel.

iii.    *Projections for the five-year period of payment proposed by the Plan together with assumptions underlying those projections.*

See **Exhibit D**.

Assumptions underlying projections–

a.      Confirmation of this Plan.

b.      Payments to be made according to the Plan.

c.      As all projections are inherently speculative, Debtor makes no representation or warranty that these projections are accurate. Actual amounts of revenues and expenses may be substantially higher or lower than projected based on any number of factors including, but not limited to, the performance of the U.S. economy as a whole and in Southeast Michigan in particular, the Debtor's ability to continue to obtain new work, Debtor's vendors continuing to do business with Debtor on substantially the same terms as pre-petition, the health of Mr. Ryan and his willingness to continue working for Debtor, the continued ability retain and obtain a competent workforce, timely payments by Debtor's customers, competition from on-line and national brand office supply companies, and the cost of fuel, repairs, maintenance and other expenses.

d.      Structural costs consistent with prior history and Debtor's forecasts.

e.      Unsecured Claims substantially consistent with Debtor's Schedules.

f.      Debtor's amended projections include anticipated revenue losses as a result of the COVID-19 crisis. The projections assume that Debtor's business will continue operations with lower than usual revenues throughout 2020, with business slowing increasing back to historical norms throughout the year, and with normal business conditions in 2021.

B.      *State who will be in charge and the compensation to be paid to each, including fringe benefits.*

8

After the Effective Date of the Plan, Mr. Ryan will continue as President and sole owner. Mr. Ryan will continue to receive $2,000 per week, plus benefits. Mr. Ryan will receive annual pay increases in line with standard cost of living adjustments.

C.      *State the tax ramifications for the continuing entity if the Plan is confirmed.*

i.      *To Debtor*:  Debtor believes that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to Debtor. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to Debtor's basis in its assets or to its net operating loss carry forward. Debtor cannot accurately determine the amount and extent of any forgiveness of indebtedness. First, Debtor must determine if all of the Claims that have been filed, or deemed filed in this Case, are accurate. Also, depending on whether Debtor achieves or exceeds the projection in its current fiscal year, Debtor may elect to apply any forgiveness of a debt directly to its basis. Despite the fact that Debtor believes that it can either (a) apply such forgiveness of indebtedness to it net operating loss carry forward or (b) to its basis, it is not certain that the amount of forgiveness of debt will be totally offset by the foregoing. However, once these net operating losses are used by Debtor to offset forgiveness of indebtedness, they cannot be used again. Taxes paid by Debtor in future years could, therefore, be impacted as a result of confirmation of the Plan.

ii.      *To Creditors*:  The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. Debtor recommends that Creditors and Holders of Claims obtain independent tax counsel to advise them of the tax consequences of the Plan.

**VII.    Legal requirements.**

A.      *Voting procedures*

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately.  A creditor who asserts a claim in more than one class and who has not been provided sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).  However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing the claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is

9

important. After carefully reviewing the plan and disclosure statement, each holder of a claim or interest should vote on the enclosed ballot to either accept or to reject the plan, and then return the ballot by mail to Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to Debtor's attorney.

B.    *Acceptance*

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

C.    *Confirmation*

Section § 1129(a)of 11 U.S.C. establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are:

1.    Each class of impaired creditors and interests must accept the plan, as described in paragraph VI.B., above.

2.    Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

D.    *Modification*

Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

E. *Effect of confirmation*

*If the Plan is confirmed by the Court:*

1.    *Its terms will be binding on Debtor, all creditors, shareholders, and other parties in interest, regardless of whether they have accepted the Plan.*

2.    *Except as provided in the Plan:*

10

(a) In the case of a corporation that is reorganizing and continuing business, as in this case:

    (1) All claims and interests will be discharged.

    (2) Creditors and shareholders will be prohibited from asserting their claims against or interests in Debtor or its assets.


Submitted by:

Fourteenth Avenue Cartage
Company, Inc., Debtor


  /s/ James V. Ryan
By: James V. Ryan
Its: President


Jebco Investments, L.C.


  /s/ James V. Ryan
By: James V. Ryan
Its: Owner
Only as to commitments by Jebco Investments, L.C.
set forth in the Plan and Disclosure Statement


Prepared by:

WERNETTE HEILMAN PLLC


By: /s/ Ryan D. Heilman
Ryan D. Heilman (P63952)
Michael R. Wernette (P
Attorneys for Debtor
40900 Woodward Ave., Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 835-4745
Email: ryan@wernetteheilman.com

11

**Exhibit A to Debtor's Disclosure Statement**

| | Balance Sheet Preliminary 02/29/20 | Creditor Holding Lien | Market Value | Liquidation Adj | Liquidation Value | Amount of Secured Claim | Equity Market Value | Equity Liquidation Value |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Current Assets | | | | | | | | |
| Checking/Savings | | | | | | | | |
| Total Checking/Savings | 85,550 | Chemical Bank | 85,550 | | 85,550 | 2,853,347 | 0 | 0 |
| Accounts Receivable | | | | | | | | |
| 11000 · Accounts Receivable | 0 | | | | | | | |
| 11000 · Accounts Receivable - FCA | 1,454,616 | | 1,454,616 | 80% | 1,163,693 | 2,853,347 | 0 | 0 |
| 11000 · Accounts Receivable - Intermodal | 266,671 | | 266,671 | 50% | 133,336 | 2,853,347 | 0 | 0 |
| 11000 · Accounts Receivable - > 90 days | 5,194 | | 5,194 | 10% | 519 | 2,853,347 | 0 | 0 |
| Total Accounts Receivable | 1,726,481 | Chemical Bank | 1,726,481 | | 1,297,548 | | 0 | 0 |
| Other Current Assets | | | | | | | | |
| 1114000 · A/R - SALES ACCRUAL - EOM | 118,950 | Chemical Bank | 118,950 | 80% | 95,160 | 2,853,347 | 0 | 0 |
| 1145000 · N/P - JEBCO INVESTMENTS LC | 35,618 | Chemical Bank | 35,618 | 100% | 35,618 | 2,853,347 | 0 | 0 |
| 1150000 · INVENTORY - FUEL | 32,710 | Chemical Bank | 32,710 | 80% | 26,168 | 2,853,347 | 0 | 0 |
| 1230000 · PREPAID EXPENSES | 57,556 | Chemical Bank | 57,556 | 0% | 0 | 2,853,347 | 0 | 0 |
| 1260000 · PREPAID ASSURANCE | 54,000 | Chemical Bank | 54,000 | 100% | 54,000 | 2,853,347 | 0 | 0 |
| 1815000 · DEPOSIT AT VENDOR | 28,150 | Chemical Bank | 28,150 | 100% | 28,150 | 2,853,347 | 0 | 0 |
| Total Other Current Assets | 326,984 | | 326,984 | | 239,097 | | 0 | 0 |
| Total Current Assets | 2,139,015 | | 2,139,015 | | 1,622,194 | | 0 | 0 |
| Fixed Assets | | | | | | | | |
| 1630000 · REVENUE EQUIPMENT VEHICLES | 530,936 | Chemical Bank | 397,350 | | 232,250 | 2,853,347 | 0 | 0 |
| 1650000 · OFFICE EQUIPMENT & FIXTURES | 235,605 | Chemical Bank | 10,500 | | 3,000 | 2,853,347 | 0 | 0 |
| 1660000 · LEASEHOLD IMPROVEMENTS | 1,433,298 | Chemical Bank | | 0% | 0 | 2,853,347 | 0 | 0 |
| EQUITY IN TRAC LEASES | | | 375,000 | | 125,000 | 2,853,347 | 0 | 0 |
| 1730000 · ACCUM DEPREC, REV EQPT VEHICLES | (434,056) | | | | | | | |
| 1750000 · ACCUM DEPREC, OFF EQPT & FIX | (209,817) | | | | | | | |
| 1760000 · ACCUM DEPREC, LEASEHOLD IMP | (510,723) | | | | | | | |
| Total Fixed Assets | 1,045,243 | | 782,850 | | 360,250 | | 0 | 0 |
| | | | | | | | | |
| AVOIDANCE ACTIONS | | | | | | | | |
| CUSTOMER LISTS | | | | | 0 | | 0 | 0 |
| TOTAL ASSETS | 3,184,258 | | 2,921,865 | | 1,982,444 | | 0 | 0 |
| | | | | | | | | |
| Costs of Liquidation - 50% of Loeb Estimate | | | | | (37,500) | | | (37,500) |
| Costs of Liquidation - Professional Fees | | | | | (60,000) | | | (60,000) |
| Costs of Liquidation - Chapter 7 Trustee | | | | | (99,122) | | | (99,122) |
| | | | | | | | | |
| ESTIMATED ASSET VALUE AVAILABLE FOR DISTRIBUTION | | | | | 1,785,822 | | | (196,622) |

III CLAIMS

(a) PRE-PETITION SECURED DEBT

| | | | | | | |
|---|---|---|---|---|---|---|
| Chemical Bank - Line of Credit | | | | $ | 504,621 | |
| Chemical Bank - Equipment Line | | | | $ | 570,580 | |
| Chemical Bank - Mortage | | | | $ | 369,560 | |
| Chemical Bank -Equipment Loan | | | | $ | 1,408,586 | |
| **Total Pre-petition Secured Debt** | | | | $ | 2,853,347 | |

(b) ADMINISTRATIVE EXPENSES
US Trustee Fees
Debtor's Attorneys
Debtor's Financial Advisors
Unsecured Creditors' Committee Counsel
Post-Petition Trade Payables $ 750,000 (Aggregate)

Total Administrative Expenses $ 750,000

(c) PRE-PETITION UNSECURED PRIORITY CLAIMS
Ohio Department of Taxation $ 12,551
Other Taxes $ 9,328

Total Pre-Petition Unsecured Priority Claims $ 21,878

(d) TOTAL SECURED, ADMINISTRATIVE AND $ 3,594,403
PRE-PETITION PRIORITY CLAIMS

IV DISTRIBUTION OF PROCEEDS OF ASSETS IN THE EVENT OF LIQUIDATION
(a) Gross Proceeds Available from Liquidation of Assets $ 1,785,822

(b) Less Total of
Secured Claims $ 1,785,822
Administrative Expenses
Priority Claims
Pre-petition Unsecured

Total $ 1,785,822

(c) Net Proceeds 0.00
Proceeds Available to Pre-petition Unsecured
Creditors (inlcuding deficiency claims) (all of
which total $ 0.00, i.e., the difference
between IV (a) and (b) above

(d) % Available to Pre-petition Unsecured Creditors 0.00

(e) Proceeds Available for Equity Interests 0.00

## FOURTEENTH AVENUE CARTAGE COMPANY, INC.
### HYPOTHETICAL LIQUIDATION ANALYSIS

**A.      Introduction**

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims in a hypothetical Chapter 7 liquidation of the assets of the Debtor. The assumptions used in the Liquidation Analysis may be affected by events or conditions not presently contemplated. These assumptions are also subject to significant uncertainties, many of which are outside of the control of the Debtor. As a result, there can be no assurance that the values set forth in the Liquidation Analysis would be realized if the Debtor's Plan is not confirmed and the Debtor's Case was converted to a Chapter 7 liquidation.

**B.      Scope, Intent, and Purpose of the Liquidation Analysis**

The determination of the costs of, and hypothetical proceeds from, the liquidation of the assets of the Debtor is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor, its management, and its professionals. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation. In addition, neither management of the Debtor nor its Professionals can judge with any degree of certainty the impact of the liquidation asset sales on the recoverable value of the assets of the Debtor. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor was liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. Neither the Debtor nor its Professionals make any representation or warranty that the actual results would or would not approximate the estimates and assumptions represented in the Liquidation Analysis. Actual results could vary materially.

**C.      General Notes**

1.      Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Chapter 11 case of the Debtor to a Chapter 7 liquidation case. As of the Conversion Date, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") to oversee the liquidation of the estate of the Debtor.

1

2.        Assets to be Liquidated

The Liquidation Analysis assumes a liquidation of all of the Debtors' assets which primarily consist of cash in the bank, trade accounts receivable, and equipment. The Liquidation Analysis uses the estimated asset value as noted in the comments. Debtor has not had a recent valuation or physical inventory performed to verify the scheduled values, so the values should be understood to be Debtor's best estimates, as are the liquidation values set forth in this analysis.

3.        Estimated Costs of Liquidation

Wind-down costs consist of the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors. Chapter 7 Trustee fees necessary to facilitate the sale of the assets of the Debtor were assumed to equal 5% of the liquidation proceeds generated. This estimate also takes into account the time that will be required for the Trustee and any professionals to become educated with respect to the business of the Debtor and the Chapter 11 case.

Professional fees have been estimated at $60,000 or $20,000 per month for three months. Higher returns may be possible over a longer liquidation period, but a longer holding liquidation period will also entail higher costs.

**D.**     **Key Assumptions**

1.        Cash and Cash Equivalents

Cash is assumed to be recovered at 100% of the stated value.

2.        Accounts Receivable

Assuming that a conversion to Chapter 7 would result in a cessation of operations and inability to complete deliver current loads, the Liquidation Analysis assumes that the Debtor would collect 80% of the outstanding FCA accounts receivable deemed collectible, 50% of outstanding Intermodal accounts receivable deemed collectible and 10% of over 90 day accounts receivables per the Debtor's current cash flow projections. Current customers would likely seek to offset amounts owed to the Debtor against charges to the Debtor for Debtor's failure to deliver loads and costs incurred in finding and working with new vendors.

3.        Inventory

It is assumed that the Debtor would receive a credit from Penske for the 160 gallons of fuel in each tractor, but the credit would amount to 80% of the cost of the fuel

4. Prepaid Expenses

The Liquidation Analysis assumes that there would be zero recovery on prepaid expenses as it assumes that all prepaid assets would be fully amortized by the completion of the liquidation and would have zero recovery.

5. Furniture and Fixtures

Debtor has minimal furniture and fixtures, mostly consisting of office furniture, office supplies, and older computers with a limited market value per the May 2019 appraisal. Accordingly, in a liquidation, Debtor would not expect to obtain more than $3,000 even in an optimistic projection.

6. Equipment

In a liquidation, Debtor's equipment would be sold without an operating business and in a relatively fast time frame. Accordingly, the Debtor believes this would impact the value which could be generated in a liquidation sale. Debtor's estimate therefore assumes a forced sale liquidation value in accordance with an August 2019 appraisal by Loeb Term Solutions.

7. Avoidance Actions and Other Causes of Action

The Debtor has not undertaken a review of potential Avoidance Actions. However, Debtor believes that a Trustee would be able to recover some net returns from Avoidance Action and attempts to collect old receivables and other causes of action. However, the Plan provides that these Avoidance Actions will be provided to the Debtor Trust if the Plan is confirmed. Accordingly, the value of Avoidance Actions will vest in General Unsecured Creditors whether the Plan is confirmed or converted and, therefore, the Liquidation Analysis does not include any potential value to be obtained through pursuit of any specific potential Avoidance Actions.

E. **Estimated Recoveries**

In preparing the Liquidation Analysis, the Debtor estimated the amount of Allowed Claims based upon internal information and claims filed to date. In addition, the Liquidation Analysis includes estimates for claims not currently asserted in the Chapter 11 Cases, but which could be asserted and allowed in a Chapter 7 liquidation, including but not limited to administrative claims, wind-down costs, and trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The estimate of Allowed Claims set forth in the Liquidation Analysis by the Debtor should not be relied on for any other purpose including determining the value of any distribution to be made on account of Allowed Claims under the Plan. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission of the Debtor. The actual amount of Allowed Claims in the Chapter 11 case could materially differ from the estimated amounts set forth in the Liquidation Analysis.

3

1.      Pre-Petition Secured Debt

Pre-petition secured debt is based on the estimated amounts owed to Class I Claims of Chemical Bank.

2.      Administrative and Priority Claims

Administrative and priority claims are projected to approximate $750,000 in the aggregate, including post-petition vendor and supplier claims that would be unpaid in a Chapter 7 case, Chapter 11 professional fees, accrued and future U.S. Trustee fees, and 20-day claims under 503(b)(9).

3.      Trade and Other General Unsecured Claims

These claims include all claim not listed as above as secured, administrative or priority claims and are projected to total approximately $1.26 million as of the Petition Date. The Liquidation Analysis estimates that these claims would distributions equal to receive **0%** of their value in a Chapter 7 liquidation.

4.      Claims of Equity Interests

The Liquidation Analysis estimate that there would be insufficient liquidation proceeds for any recovery related to these claims in a Chapter 7 liquidation.

4

10:53 AM

03/16/20

Accrual Basis

# Fourteenth Avenue Cartage Co., Inc.
# Profit & Loss
### January through December 2017

|  | TOTAL |
|---|---|
| **Ordinary Income/Expense** |  |
| **Income** |  |
| 3000000 · GENERAL CARTAGE REVENUE | 2,346,477.64 |
| 3010000 · CONCEPP - O/S CARTAGE | 23,054.00 |
| 3020000 · MISC INCOME ACCOUNT | 14,829.50 |
| 3030000 · HANDLING | 36,138.00 |
| 3098000 · CHRYSLER - T/L - US OWNER OP | 3,424,176.94 |
| 3099000 · CHRYSLER - T/L - COMP & LEASE | 4,756,602.62 |
| **Total Income** | 10,601,278.70 |
| **Cost of Goods Sold** |  |
| 4020000 · DEPRECIATION  & AMORTIZATION | 160,797.75 |
| 4030000 · DRIVERS' WAGES | 171,927.48 |
| 4040000 · MECHANICS' LABOR | 224,813.71 |
| 4040010 · MECHANIC'S LABOR OFFSET | -279,181.30 |
| 4140000 · DOCKMAN WAGES - CONSOLIDATION | 55,410.73 |
| 4150000 · SICK, PERS, B-DAY, HOLIDAY PAY | 6,864.00 |
| 4160000 · VACATION WAGES EXPENSE | 14,202.00 |
| 4169000 · EQPT RENTAL - OFFSET | -2,907,784.86 |
| 4170000 · EQUIPMENT RENTAL | 3,549,644.83 |
| 4175000 · SERVICE CONTRACTS - RADIO EQPT | 52,186.38 |
| 4180000 · FREIGHT CHARGES | 211.23 |
| 4185000 · O/S DRIVER SERVICES | 3,448,029.56 |
| 4190000 · U.S. OWNER OP MILEAGE EXPENSE | 901,349.59 |
| 4191000 · FSC OFFSET - US OWNER OP | -351,504.53 |
| 4192000 · U.S. OWN/OP FSC SUPPLEMENT | 143,531.08 |
| 4193000 · VEH LICENSES & PERMITS - US OO | 28,703.76 |
| 4195000 · O/S CARRIER SVCS - OTH | 30,230.00 |
| 4200000 · GAS & OIL | 1,676,447.00 |
| 4201000 · FSC OFFSET - COMP & LEASE | -761,468.74 |
| 4210000 · INSURANCE - FLEET | 540,451.87 |
| 4215000 · INSURANCE - CLAIMS, DEDUCTIBLES | 5,744.39 |
| 4220000 · INSURANCE - GROUP | 120,982.97 |
| 4225000 · INSURANCE - WORKERS' COMP | 37,529.30 |
| 4230000 · PAYROLL TAXES | 41,232.47 |
| 4240000 · FEDERAL HIGHWAY USE TAX | 37,400.00 |
| 4270000 · OTHER TAXES & LICENSES | 238,510.55 |
| 4280000 · FINES AND VIOLATIONS | 1,472.00 |
| 4290000 · TIRES & RIMS | 158,355.99 |
| 4295000 · FLAT & TUBE REPAIR - TIRES | 45,390.66 |
| 4300000 · VEHICLE LICENSES & PERMITS | 120,336.15 |
| 4305000 · MAINTENANCE FACILITY - BLDG REN | 13,713.60 |
| 4310000 · R & M VEH REPAIR EXP | 40,639.15 |
| 4310010 · R & M VEH REP - OFFSET | -210,272.42 |
| 4310025 · PARTS - TRACTOR REPAIRS | 380,963.09 |
| 4310050 · PARTS - TRAILER REPAIRS | 106,567.74 |

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2017

| | TOTAL |
|---|---|
| 4311000 · R & M - OUTSIDE SERVICES | 261,239.68 |
| 4311025 · OUTSIDE R & M - TRACTORS | 175,145.58 |
| 4311050 · OUTSIDE R & M - TRAILERS | 209,620.49 |
| 4313000 · FSC - PARTS | 1,578.48 |
| 4315000 · R & M VEH - SVC CALLS - TOW EXP | 16,350.22 |
| 4320000 · SHOP SUPPLIES | 21,024.24 |
| 4325000 · R & M - SMALL SHOP TOOLS | 3,180.54 |
| 4330000 · UNIFORMS | 51,129.85 |
| 4345000 · TRAVEL - ROAD EXPENSE | 32,870.12 |
| 4350000 · REPAIRS & MAINT - GARAGE | 542.20 |
| 4360000 · SECURITY | 109,296.00 |
| 4380000 · PERSONNEL COSTS / MISC EXP | 8,571.83 |
| 4385000 · SAFETY & TRAINING MATERIALS | 21,658.37 |
| 7057000 · CANADIAN O\O EXPENSE | 73,806.27 |
| 7057000 · CANADIAN O/O FSC SUPPLEMENT | -12,308.55 |
| **Total COGS** | 8,817,132.50 |
| **Gross Profit** | 1,784,146.20 |
| **Expense** | |
| 5010000 · ADVERTISING | 1,841.50 |
| 5050000 · PROFESSIONAL SERVICE FEE | 100,811.40 |
| 5060000 · OFFICE SUPPLIES & EXPENSES | 9,186.81 |
| 5060500 · OFFICE SUPPLIES - PRINTED MAT'L | 1,062.72 |
| 5065000 · OFFICE COMPUTER SUPPLIES & EXP | 25,807.10 |
| 5066000 · SERVICE CONTRACTS - OFFICE EQPT | 45,951.59 |
| 5090000 · OFFICE SALARIES | 1,082,801.94 |
| 5095000 · CLERICAL WAGES - CONSOLIDATED | 210,590.76 |
| 5095500 · SICK, PERS, B DAY, HOLIDAY PAY | 8,868.00 |
| 5096000 · VACATION WAGE EXPENSE | 19,297.50 |
| 5099000 · PAYROLL TAXES - ADMIN | 98,386.24 |
| 5100000 · OFFICERS' LIFE INSURANCE | 1,482.84 |
| 5110000 · CONTRIBUTIONS | 1,700.00 |
| 5115000 · R & M BLDG - HVAC SYSTEM | 4,875.45 |
| 5120000 · REPAIRS & MAINT - OFF BLDG | 21,815.81 |
| 5120500 · R & M - 4401 PROPERTY - GROUNDS | 39,704.08 |
| 5121000 · BLDG MAINT - JANITORIAL SERVICE | 10,980.00 |
| 5125000 · R & M BLDG - WASTE REMOVAL | 8,160.51 |
| 5130000 · RENT | 142,459.80 |
| 5130010 · RENT - INCOME - OFFSET | -631,935.00 |
| 5150000 · DUES & SUBSCRIPTIONS | 2,180.93 |
| 5160000 · STATE INCOME TAX EXPENSE | -1,678.00 |
| 5170000 · TELEPHONE | 49,409.52 |
| 5175000 · TELEPHONE - MAINTENANCE | 255.00 |
| 5180000 · MISC TAXES & LICENSES | 3,131.67 |
| 5185000 · EQUIPMENT LEASE RENTAL | 63,682.08 |
| 5190000 · DEPRECIATION | 26,497.21 |

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2017

| | TOTAL |
|---|---|
| 5195000 · INSURANCE - GROUP - ADMIN | 231,858.85 |
| 5199000 · INSURANCE - WORKERS' COMP - ADM | 7,052.34 |
| 5200000 · PROPERTY TAXES | 23,570.34 |
| 5215000 · PROMOTION | 1,412.82 |
| 5230000 · HEAT, LIGHT  WATER | 72,222.09 |
| 5260000 · BANK CHARGES EXPENSE | 11,646.41 |
| 5265000 · FEES | 55,643.04 |
| 5275000 · INSURANCE - GENERAL | 97,781.80 |
| **Total Expense** | 1,848,515.15 |
| **Net Ordinary Income** | -64,368.95 |
| **Other Income/Expense** | |
| **Other Income** | |
| 7110000 · SNACK VEND INC | 1,551.77 |
| 7135000 · GAIN/(LOSS) ON FRGN EXCH | -119.30 |
| 7145000 · GAIN (LOSS) ON SALE OF EQUIP | 41,376.02 |
| 7150000 · DISCOUNTS EARNED | -2,865.58 |
| **Total Other Income** | 39,942.91 |
| **Other Expense** | |
| 7100000 · VENDING SNACK MACHINE | 4,862.34 |
| 7130000 · INTEREST EXPENSE | 4,716.51 |
| 7950000 · FEDERAL INCOME TAX EXPENSE | -16,051.00 |
| **Total Other Expense** | -6,472.15 |
| **Net Other Income** | 46,415.06 |
| **Net Income** | **-17,953.89** |

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2017

|  | Dec 31, 17 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1006000 · CASH IN BANK - CHEMICAL | 88,741.19 |
| **Total Checking/Savings** | 88,741.19 |
| **Accounts Receivable** | |
| 11000 · Accounts Receivable | 1,488,220.70 |
| **Total Accounts Receivable** | 1,488,220.70 |
| **Other Current Assets** | |
| 1020000 · PREPAID BRIDGE TOLLS | 6,152.00 |
| 1114000 · A/R - SALES ACCRUAL - EOM | 111,612.93 |
| 1130000 · LESS ALLOW FOR DOUBTFUL ACCT | -35,326.72 |
| 1140000 · ACCTS RECEIVABLE - TRADE | -4,876.84 |
| 1142000 · ACCTS RECEIVABLE - TRADE - TLS | 355.89 |
| 1145000 · N/P - JEBCO INVESTMENTS LC | 1,432,824.90 |
| 1150000 · INVENTORY - FUEL | 45,262.39 |
| 1160000 · EMPLOYEE ADVANCES - PURCHASES | 22,514.95 |
| 1165000 · BROKER 1099 A/P ITEMS | 40,244.79 |
| 1200000 · PREPAID INSURANCE | 94,510.10 |
| 1220000 · PREPAID LICENSES | 46,508.55 |
| 1225000 · PREPAID TAXES | 45,432.00 |
| 1240000 · PREPAID TIRES | 160,900.41 |
| 1245000 · TIRES - RECAP INVENTORY | 4,580.91 |
| 1815000 · DEPOSIT AT VENDOR | 126,627.00 |
| **Total Other Current Assets** | 2,097,323.26 |
| **Total Current Assets** | 3,674,285.15 |
| **Fixed Assets** | |
| 1630000 · REVENUE EQUIPMENT VEHICLES | 880,028.88 |
| 1650000 · OFFICE EQUIPMENT & FIXTURES | 185,832.37 |
| 1660000 · LEASEHOLD IMPROVEMENTS | 646,426.74 |
| 1730000 · ACCUM DEPREC, REV EQPT VEHICLES | -687,417.48 |
| 1750000 · ACCUM DEPREC, OFF EQPT & FIX | -172,767.32 |
| 1760000 · ACCUM DEPREC, LEASEHOLD IMP | -447,873.26 |
| **Total Fixed Assets** | 404,229.93 |
| **TOTAL ASSETS** | 4,078,515.08 |

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2017

|  | Dec 31, 17 |
|---|---|
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Current Liabilities** | |
|       **Accounts Payable** | |
|         20000 · Accounts Payable | 543,174.30 |
| | |
|       **Total Accounts Payable** | 543,174.30 |
| | |
|       **Other Current Liabilities** | |
|         2000000 · CUSTOMER DEPOSITS HELD | 21,585.77 |
|         2020000 · ACCOUNTS PAYABLE - Payment Plan | -55,577.48 |
|         2025000 · ACCOUNTS PAYABLE - TRADE | 494,643.79 |
|         2110000 · FICA & FWH | 653.72 |
|         2220000 · ACCRUED PAYROLL | 24,281.61 |
|         2260000 · DEFERRED FIT PAYABLE | 88,495.00 |
|         2270000 · FEDERAL INCOME TAX PAYABLE | -126,031.00 |
| | |
|       **Total Other Current Liabilities** | 448,051.41 |
| | |
|     **Total Current Liabilities** | 991,225.71 |
| | |
|     **Long Term Liabilities** | |
|       2620000 · NP - CHEMICAL - 08/13/14 | 600,000.00 |
| | |
|     **Total Long Term Liabilities** | 600,000.00 |
| | |
|   **Total Liabilities** | 1,591,225.71 |
| | |
|   **Equity** | |
|     2810000 · ISSUED & OUTSTANDING SHARES | 15,000.00 |
|     2830000 · RETAINED EARNINGS - BEG BAL | 2,490,243.26 |
|     Net Income | -17,953.89 |
| | |
|   **Total Equity** | 2,487,289.37 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 4,078,515.08 |

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2018

|  | TOTAL |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| 3000000 · GENERAL CARTAGE REVENUE | 2,350,506.10 |
| 3010000 · CONCEPP - O/S CARTAGE | 75.00 |
| 3020000 · MISC INCOME ACCOUNT | 45,881.25 |
| 3025000 · R/R CONTAINER REVENUE | 503.02 |
| 3030000 · HANDLING | 26,318.00 |
| 3098000 · CHRYSLER - T/L - US OWNER OP | 3,423,138.67 |
| 3099000 · CHRYSLER - T/L - COMP & LEASE | 6,727,292.95 |
| **Total Income** | 12,573,714.99 |
| **Cost of Goods Sold** | |
| 4020000 · DEPRECIATION  & AMORTIZATION | 62,671.43 |
| 4030000 · DRIVERS' WAGES | 817,727.00 |
| 4040000 · MECHANICS' LABOR | 49,629.10 |
| 4040010 · MECHANIC'S LABOR OFFSET | -910.00 |
| 4050000 · DRIVER WAGES - OTR | 1,692.06 |
| 4140000 · DOCKMAN WAGES - CONSOLIDATION | 68,528.20 |
| 4150000 · SICK, PERS, B-DAY, HOLIDAY PAY | 28,864.00 |
| 4160000 · VACATION WAGES EXPENSE | 24,498.00 |
| 4169000 · EQPT RENTAL - OFFSET | -2,150,897.83 |
| 4170000 · EQUIPMENT RENTAL | 5,263,988.39 |
| 4175000 · SERVICE CONTRACTS - RADIO EQPT | 138,417.53 |
| 4180000 · FREIGHT CHARGES | 2,938.05 |
| 4185000 · O/S DRIVER SERVICES | 4,633,690.58 |
| 4190000 · U.S. OWNER OP MILEAGE EXPENSE | 417,249.45 |
| 4191000 · FSC OFFSET - US OWNER OP | -425,349.45 |
| 4192000 · U.S. OWN/OP FSC SUPPLEMENT | 128,708.61 |
| 4193000 · VEH LICENSES & PERMITS - US OO | 7,175.94 |
| 4195000 · O/S CARRIER SVCS - OTH | 94,145.00 |
| 4200000 · GAS & OIL | 2,337,111.95 |
| 4201000 · FSC OFFSET - COMP & LEASE | -1,106,842.78 |
| 4210000 · INSURANCE - FLEET | 554,594.48 |
| 4215000 · INSURANCE - CLAIMS, DEDUCTIBLES | 5,280.17 |
| 4220000 · INSURANCE - GROUP | 161,314.28 |
| 4225000 · INSURANCE - WORKERS' COMP | 158,075.97 |
| 4230000 · PAYROLL TAXES | 83,543.18 |
| 4240000 · FEDERAL HIGHWAY USE TAX | 19,433.34 |
| 4270000 · OTHER TAXES & LICENSES | 279,243.24 |
| 4280000 · FINES AND VIOLATIONS | -50.00 |
| 4290000 · TIRES & RIMS | 165,193.85 |
| 4295000 · FLAT & TUBE REPAIR - TIRES | 4,580.91 |
| 4300000 · VEHICLE LICENSES & PERMITS | 49,465.42 |
| 4305000 · MAINTENANCE FACILITY - BLDG REN | 7,142.80 |
| 4310000 · R & M VEH REPAIR EXP | 558,990.64 |
| 4310010 · R & M VEH REP - OFFSET | -539.16 |

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2018

| | TOTAL |
|---|---:|
| 4310025 · PARTS - TRACTOR REPAIRS | 52,408.08 |
| 4310050 · PARTS - TRAILER REPAIRS | 26,142.76 |
| 4311000 · R & M - OUTSIDE SERVICES | 14,534.39 |
| 4311025 · OUTSIDE R & M - TRACTORS | 13,924.45 |
| 4311050 · OUTSIDE R & M - TRAILERS | 316,798.30 |
| 4313000 · FSC - PARTS | 997.50 |
| 4315000 · R & M VEH - SVC CALLS - TOW EXP | 16,152.50 |
| 4320000 · SHOP SUPPLIES | 11,688.43 |
| 4325000 · R & M - SMALL SHOP TOOLS | 122.00 |
| 4330000 · UNIFORMS | 31,853.48 |
| 4345000 · TRAVEL - ROAD EXPENSE | 94,172.02 |
| 4360000 · SECURITY | 115,968.00 |
| 4380000 · PERSONNEL COSTS / MISC EXP | 18,468.96 |
| 4385000 · SAFETY & TRAINING MATERIALS | 24,819.95 |
| 7055000 · CANADIAN O\O EXPENSE | 63,039.00 |
| 7057000 · CANADIAN O/O FSC SUPPLEMENT | -12,829.95 |
| **Total COGS** | 13,227,564.22 |
| **Gross Profit** | -653,849.23 |
| **Expense** | |
| 5030000 · BAD DEBTS | 148,052.26 |
| 5050000 · PROFESSIONAL SERVICE FEE | 264,630.92 |
| 5060000 · OFFICE SUPPLIES & EXPENSES | 49,466.72 |
| 5060500 · OFFICE SUPPLIES - PRINTED MAT'L | 3,237.27 |
| 5065000 · OFFICE COMPUTER SUPPLIES & EXP | 8,921.57 |
| 5066000 · SERVICE CONTRACTS - OFFICE EQPT | 45,590.80 |
| 5090000 · OFFICE SALARIES | 965,927.78 |
| 5094000 · TEMPORARY - CLERICAL SERVICES | 808.50 |
| 5095000 · CLERICAL WAGES - CONSOLIDATED | 444,778.10 |
| 5095500 · SICK, PERS, B DAY, HOLIDAY PAY | 4,900.00 |
| 5096000 · VACATION WAGE EXPENSE | 3,000.00 |
| 5099000 · PAYROLL TAXES - ADMIN | 95,793.93 |
| 5100000 · OFFICERS' LIFE INSURANCE | 6,920.84 |
| 5110000 · CONTRIBUTIONS | 500.00 |
| 5115000 · R & M BLDG - HVAC SYSTEM | 4,346.64 |
| 5120000 · REPAIRS & MAINT - OFF BLDG | 27,932.45 |
| 5120500 · R & M - 4401 PROPERTY - GROUNDS | 101,096.25 |
| 5121000 · BLDG MAINT - JANITORIAL SERVICE | 10,980.00 |
| 5125000 · R & M BLDG - WASTE REMOVAL | 23,475.36 |
| 5130000 · RENT | 110,740.68 |
| 5130010 · RENT - INCOME - OFFSET | -5,355.00 |
| 5150000 · DUES & SUBSCRIPTIONS | 330.85 |
| 5170000 · TELEPHONE | 53,147.37 |
| 5175000 · TELEPHONE - MAINTENANCE | 2,569.68 |
| 5180000 · MISC TAXES & LICENSES | 499.00 |
| 5185000 · EQUIPMENT LEASE RENTAL | 41,085.89 |

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2018

| | TOTAL |
|---|---|
| 5190000 · DEPRECIATION | 14,823.10 |
| 5195000 · INSURANCE - GROUP - ADMIN | 276,488.10 |
| 5199000 · INSURANCE - WORKERS' COMP - ADM | 31,665.95 |
| 5200000 · PROPERTY TAXES | 32,178.03 |
| 5215000 · PROMOTION | 487.60 |
| 5230000 · HEAT, LIGHT  WATER | 36,823.81 |
| 5260000 · BANK CHARGES EXPENSE | 15,238.00 |
| 5265000 · FEES | 29,394.20 |
| 5275000 · INSURANCE - GENERAL | 25,135.35 |
| **Total Expense** | 2,875,612.00 |
| **Net Ordinary Income** | -3,529,461.23 |
| Other Income/Expense | |
| Other Income | |
| 7135000 · GAIN/(LOSS) ON FRGN EXCH | -12.00 |
| 7145000 · GAIN (LOSS) ON SALE OF EQUIP | -155,473.84 |
| 7150000 · DISCOUNTS EARNED | -726.10 |
| **Total Other Income** | -156,211.94 |
| Other Expense | |
| 7100000 · VENDING SNACK MACHINE | 15,278.08 |
| 7130000 · INTEREST EXPENSE | 44,711.30 |
| **Total Other Expense** | 59,989.38 |
| **Net Other Income** | -216,201.32 |
| **Net Income** | **-3,745,662.55** |

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2018

|  | Dec 31, 18 |
| --- | ---: |
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1006000 · CASH IN BANK - CHEMICAL | 228,232.61 |
| **Total Checking/Savings** | 228,232.61 |
| **Accounts Receivable** | |
| 11000 · Accounts Receivable | 1,631,026.99 |
| **Total Accounts Receivable** | 1,631,026.99 |
| **Other Current Assets** | |
| 1020000 · PREPAID BRIDGE TOLLS | 6,152.00 |
| 1114000 · A/R - SALES ACCRUAL - EOM | 111,612.93 |
| 1130000 · LESS ALLOW FOR DOUBTFUL ACCT | -183,378.98 |
| 1140000 · ACCTS RECEIVABLE - TRADE | -3,731.32 |
| 1142000 · ACCTS RECEIVABLE - TRADE - TLS | 355.89 |
| 1145000 · N/P - JEBCO INVESTMENTS LC | 635,757.85 |
| 1150000 · INVENTORY - FUEL | 45,262.39 |
| 1160000 · EMPLOYEE ADVANCES - PURCHASES | 13,371.44 |
| 1165000 · BROKER 1099 A/P ITEMS | 20,780.22 |
| 1168000 · IFTA FUEL TAX CLEARING | -4,600.00 |
| 1200000 · PREPAID INSURANCE | 253,809.72 |
| 1220000 · PREPAID LICENSES | 10,074.21 |
| 1225000 · PREPAID TAXES | 26,731.98 |
| **Total Other Current Assets** | 932,198.33 |
| **Total Current Assets** | 2,791,457.93 |
| **Fixed Assets** | |
| 1630000 · REVENUE EQUIPMENT VEHICLES | 451,694.82 |
| 1650000 · OFFICE EQUIPMENT & FIXTURES | 235,604.52 |
| 1660000 · LEASEHOLD IMPROVEMENTS | 1,433,297.87 |
| 1730000 · ACCUM DEPREC, REV EQPT VEHICLES | -374,949.96 |
| 1750000 · ACCUM DEPREC, OFF EQPT & FIX | -187,590.42 |
| 1760000 · ACCUM DEPREC, LEASEHOLD IMP | -476,078.09 |
| **Total Fixed Assets** | 1,081,978.74 |
| **TOTAL ASSETS** | **3,873,436.67** |

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2018

|  | Dec 31, 18 |
|---|---:|
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 20000 · Accounts Payable | 1,161,866.33 |
| **Total Accounts Payable** | 1,161,866.33 |
| **Other Current Liabilities** | |
| 2000000 · CUSTOMER DEPOSITS HELD | 31,374.49 |
| 2020000 · ACCOUNTS PAYABLE - Payment Plan | 192,206.00 |
| 2025000 · ACCOUNTS PAYABLE - TRADE | 1,930,233.27 |
| 2220000 · ACCRUED PAYROLL | 46,555.70 |
| 2260000 · DEFERRED FIT PAYABLE | 88,495.00 |
| 2270000 · FEDERAL INCOME TAX PAYABLE | -126,031.00 |
| 2280000 · STATE INCOME TAX PAYABLE | 4,494.00 |
| 2540000 · NOTES PAYABLE - OFFICER | 52,402.32 |
| **Total Other Current Liabilities** | 2,219,729.78 |
| **Total Current Liabilities** | 3,381,596.11 |
| **Long Term Liabilities** | |
| 2605000 · CHEMICAL BANK - LOC | 1,150,213.74 |
| 2630 · NP - CHEMICAL #4357 | 600,000.00 |
| **Total Long Term Liabilities** | 1,750,213.74 |
| **Total Liabilities** | 5,131,809.85 |
| **Equity** | |
| 2810000 · ISSUED & OUTSTANDING SHARES | 15,000.00 |
| 2830000 · RETAINED EARNINGS - BEG BAL | 2,472,289.37 |
| Net Income | -3,745,662.55 |
| **Total Equity** | -1,258,373.18 |
| **TOTAL LIABILITIES & EQUITY** | 3,873,436.67 |

# Fourteenth Avenue Cartage Co., Inc.
# Profit & Loss
### January through December 2019

|  | Jan - Dec 19 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| 3000000 · GENERAL CARTAGE REVENUE | 1,541,273.41 |
| 3020000 · MISC INCOME ACCOUNT | 13,706.25 |
| 3030000 · HANDLING | 16,670.00 |
| 3098000 · CHRYSLER - T/L - US OWNER OP | 1,801,558.66 |
| 3099000 · CHRYSLER - T/L - COMP & LEASE | 7,878,106.25 |
| **Total Income** | 11,251,314.57 |
| **Cost of Goods Sold** | |
| 4020000 · DEPRECIATION  & AMORTIZATION | 79,414.83 |
| 4030000 · DRIVERS' WAGES | 1,141,772.85 |
| 4040010 · MECHANIC'S LABOR OFFSET | -35,094.75 |
| 4050000 · DRIVER WAGES - OTR | 255,185.79 |
| 4140000 · DOCKMAN WAGES - CONSOLIDATION | 19,071.40 |
| 4150000 · SICK, PERS, B-DAY, HOLIDAY PAY | 37,464.00 |
| 4160000 · VACATION WAGES EXPENSE | 20,223.00 |
| 4169000 · EQPT RENTAL - OFFSET | -3,227,470.97 |
| 4170000 · EQUIPMENT RENTAL | 4,565,361.66 |
| 4175000 · SERVICE CONTRACTS - RADIO EQPT | 91,884.45 |
| 4185000 · O/S DRIVER SERVICES | 3,941,390.67 |
| 4190000 · U.S. OWNER OP MILEAGE EXPENSE | 113,313.05 |
| 4191000 · FSC OFFSET - US OWNER OP | -211,610.65 |
| 4192000 · U.S. OWN/OP FSC SUPPLEMENT | 22,653.43 |
| 4195000 · O/S CARRIER SVCS - OTH | 12,512.50 |
| 4200000 · GAS & OIL | 2,119,373.08 |
| 4201000 · FSC OFFSET - COMP & LEASE | -1,250,010.00 |
| 4210000 · INSURANCE - FLEET | 869,377.86 |
| 4215000 · INSURANCE - CLAIMS, DEDUCTIBLES | 5,374.31 |
| 4220000 · INSURANCE - GROUP | 166,527.39 |
| 4225000 · INSURANCE - WORKERS' COMP | 216,678.02 |
| 4230000 · PAYROLL TAXES | 122,523.81 |
| 4270000 · OTHER TAXES & LICENSES | 239,904.68 |
| 4280000 · FINES AND VIOLATIONS | 4,329.13 |
| 4290000 · TIRES & RIMS | 10,853.92 |
| 4295000 · FLAT & TUBE REPAIR - TIRES | 20,109.81 |
| 4300000 · VEHICLE LICENSES & PERMITS | 12,199.53 |
| 4305000 · MAINTENANCE FACILITY - BLDG REN | -6,000.00 |
| 4310000 · R & M VEH REPAIR EXP | 1,058.73 |
| 4310010 · R & M VEH REP - OFFSET | -35,418.88 |
| 4310025 · PARTS - TRACTOR REPAIRS | -2,354.66 |
| 4310050 · PARTS - TRAILER REPAIRS | 321.38 |
| 4311000 · R & M - OUTSIDE SERVICES | 10,008.67 |
| 4311025 · OUTSIDE R & M - TRACTORS | 530,684.64 |
| 4311050 · OUTSIDE R & M - TRAILERS | 297,773.84 |
| 4315000 · R & M VEH - SVC CALLS - TOW EXP | 6,176.80 |
| 4320000 · SHOP SUPPLIES | -464.00 |
| 4330000 · UNIFORMS | 3,353.88 |
| 4340000 · CASUAL LABOR | 431.11 |
| 4345000 · TRAVEL - ROAD EXPENSE | 149,978.00 |
| 4360000 · SECURITY | 116,895.10 |
| 4380000 · PERSONNEL COSTS / MISC EXP | 6,310.38 |
| 4385000 · SAFETY & TRAINING MATERIALS | -5,735.92 |
| 7057000 · CANADIAN O/O FSC SUPPLEMENT | -58.48 |
| **Total COGS** | 10,436,273.39 |
| **Gross Profit** | 815,041.18 |

DISCLAIMER: Possible year end adjustments, CPA's have not been in to review

# Fourteenth Avenue Cartage Co., Inc.
## Profit & Loss
### January through December 2019

|  | Jan - Dec 19 |
|---|---:|
| **Expense** | |
| 5010000 · ADVERTISING | 2,000.00 |
| 5050000 · PROFESSIONAL SERVICE FEE | 331,286.20 |
| 5060000 · OFFICE SUPPLIES & EXPENSES | 7,386.41 |
| 5060500 · OFFICE SUPPLIES - PRINTED MAT'L | 47.70 |
| 5065000 · OFFICE COMPUTER SUPPLIES & EXP | 12,643.99 |
| 5066000 · SERVICE CONTRACTS - OFFICE EQPT | 59,657.57 |
| 5090000 · OFFICE SALARIES | 473,100.15 |
| 5094000 · TEMPORARY - CLERICAL SERVICES | 15,285.63 |
| 5095000 · CLERICAL WAGES - CONSOLIDATED | 339,245.13 |
| 5095500 · SICK, PERS, B DAY, HOLIDAY PAY | 2,580.00 |
| 5099000 · PAYROLL TAXES - ADMIN | 61,882.86 |
| 5100000 · OFFICERS' LIFE INSURANCE | 370.71 |
| 5115000 · R & M BLDG - HVAC SYSTEM | 320.00 |
| 5120000 · REPAIRS & MAINT - OFF BLDG | 39.39 |
| 5120500 · R & M - 4401 PROPERTY - GROUNDS | 66,094.22 |
| 5121000 · BLDG MAINT - JANITORIAL SERVICE | 915.00 |
| 5125000 · R & M BLDG - WASTE REMOVAL | 7,799.05 |
| 5130000 · RENT | 137,098.57 |
| 5130010 · RENT - INCOME - OFFSET | -18,000.00 |
| 5140000 · COST OF QUALITY - ISO | 368.73 |
| 5150000 · DUES & SUBSCRIPTIONS | 452.95 |
| 5160000 · STATE INCOME TAX EXPENSE | -4,494.00 |
| 5170000 · TELEPHONE | 61,711.39 |
| 5175000 · TELEPHONE - MAINTENANCE | 2,211.40 |
| 5185000 · EQUIPMENT LEASE RENTAL | 23,967.99 |
| 5190000 · DEPRECIATION | 19,050.60 |
| 5195000 · INSURANCE - GROUP - ADMIN | 296,151.08 |
| 5199000 · INSURANCE - WORKERS' COMP - ADM | 41,570.15 |
| 5200000 · PROPERTY TAXES | 56,114.24 |
| 5215000 · PROMOTION | 1,784.00 |
| 5230000 · HEAT, LIGHT  WATER | 21,088.13 |
| 5260000 · BANK CHARGES EXPENSE | 49,262.24 |
| 5265000 · FEES | 15,949.52 |
| 5275000 · INSURANCE - GENERAL | 25,537.51 |
| **Total Expense** | 2,110,478.51 |
| **Net Ordinary Income** | -1,295,437.33 |
| **Other Income/Expense** | |
| **Other Income** | |
| 7040000 · INTEREST INCOME | 43.65 |
| 7135000 · GAIN/(LOSS) ON FRGN EXCH | -11,000.00 |
| 7150000 · DISCOUNTS EARNED | 7,901.56 |
| **Total Other Income** | -3,054.79 |
| **Other Expense** | |
| 7100000 · VENDING SNACK MACHINE | 5,132.96 |
| 7130000 · INTEREST EXPENSE | 132,637.43 |
| 7950000 · FEDERAL INCOME TAX EXPENSE | -88,495.00 |
| **Total Other Expense** | 49,275.39 |
| **Net Other Income** | -52,330.18 |
| **Net Income** | **-1,347,767.51** |

DISCLAIMER: Possible year end adjustments, CPA's have not been in to review

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2019

|  | Dec 31, 19 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1001000 · CASH IN BANK - CHEMICAL - GEN | 414,582.78 |
| 1015000 · Petty Cash | 3,000.00 |
| **Total Checking/Savings** | 417,582.78 |
| **Accounts Receivable** | |
| 11000 · Accounts Receivable | 1,612,485.68 |
| **Total Accounts Receivable** | 1,612,485.68 |
| **Other Current Assets** | |
| 1114000 · A/R - SALES ACCRUAL - EOM | 91,187.50 |
| 1130000 · LESS ALLOW FOR DOUBTFUL ACCT | -195,545.70 |
| 1145000 · N/P - JEBCO INVESTMENTS LC | 35,618.37 |
| 1150000 · INVENTORY - FUEL | 32,710.27 |
| 1200000 · PREPAID INSURANCE | -22,309.68 |
| 1230000 · PREPAID EXPENSES | 48,698.12 |
| 1260000 · PREPAID ASSURANCE | 38,000.00 |
| 1815000 · DEPOSIT AT VENDOR | 25,000.00 |
| **Total Other Current Assets** | 53,358.88 |
| **Total Current Assets** | 2,083,427.34 |
| **Fixed Assets** | |
| 1630000 · REVENUE EQUIPMENT VEHICLES | 530,936.31 |
| 1650000 · OFFICE EQUIPMENT & FIXTURES | 235,604.52 |
| 1660000 · LEASEHOLD IMPROVEMENTS | 1,433,297.87 |
| 1730000 · ACCUM DEPREC, REV EQPT VEHICLES | -422,385.03 |
| 1750000 · ACCUM DEPREC, OFF EQPT & FIX | -206,641.02 |
| 1760000 · ACCUM DEPREC, LEASEHOLD IMP | -508,057.85 |
| **Total Fixed Assets** | 1,062,754.80 |
| **TOTAL ASSETS** | **3,146,182.14** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 20000 · Accounts Payable | 3,950,376.44 |
| **Total Accounts Payable** | 3,950,376.44 |
| **Other Current Liabilities** | |
| 2020000 · ACCOUNTS PAYABLE - Payment Plan | 229,956.00 |
| 2220000 · ACCRUED PAYROLL | 15,285.10 |
| 2221000 · ACCRUED U.S. TRUSTEE | 15,000.00 |
| 2540000 · NOTES PAYABLE - OFFICER | 74,902.32 |
| **Total Other Current Liabilities** | 335,143.42 |
| **Total Current Liabilities** | 4,285,519.86 |
| **Long Term Liabilities** | |
| 2605000 · CHEMICAL BANK - LOC | |
| 2606000 · LONG TERM SECURED LIABILITY | 527,062.71 |
| **Total 2605000 · CHEMICAL BANK - LOC** | 527,062.71 |
| 2630 · NP - CHEMICAL #4357 | |
| 2631000 · LONG TERM SECURED LIABILITY | 570,579.88 |
| **Total 2630 · NP - CHEMICAL #4357** | 570,579.88 |

DISCLAIMER: Possible year end adjustments, CPA's have not been in to review

# Fourteenth Avenue Cartage Co., Inc.
## Balance Sheet
### As of December 31, 2019

|  | Dec 31, 19 |
|---|---|
| **2640000 · NP - PENSKE** |  |
| 2641000 · PENSKE PRE-PETITIONED | 297,131.10 |
| **Total 2640000 · NP - PENSKE** | 297,131.10 |
| **2650000 · NP - WELLS FARGO** |  |
| 2651000 · WELLS FARGO PRE-PETITIONED | 72,029.28 |
| **Total 2650000 · NP - WELLS FARGO** | 72,029.28 |
| **Total Long Term Liabilities** | 1,466,802.97 |
| **Total Liabilities** | 5,752,322.83 |
| **Equity** |  |
| 2810000 · ISSUED & OUTSTANDING SHARES | 15,000.00 |
| 2830000 · RETAINED EARNINGS - BEG BAL | -1,273,373.18 |
| Net Income | -1,347,767.51 |
| **Total Equity** | -2,606,140.69 |
| **TOTAL LIABILITIES & EQUITY** | 3,146,182.14 |

DISCLAIMER: Possible year end adjustments, CPA's have not been in to review

**<u>Exhibit C</u> to Debtor's Disclosure Statement**

Fourteenth Avenue Cartage Company, Inc.
Summary of Post Petition Performance

| | 2019 October | 2019 November | 2019 December | 2020 January | 2020 February | 2020 March |
|---|---|---|---|---|---|---|
| Cash | 393,319 | 417,252 | 417,583 | 7,906 | 85,550 | 61,443 |
| Accounts Receivable | 1,907,507 | 1,794,464 | 1,612,486 | 1,786,329 | 1,729,314 | 1,765,571 |
| Accounts Payable - Post Petition | 262,329 | 640,758 | 503,992 | 561,124 | 808,482 | 729,871 |
| Disbursements | 1,279,973 | 1,302,628 | 1,497,970 | 1,521,143 | 1,213,207 | 1,322,281 |
| Revenue | 950,199 | 909,487 | 946,780 | 1,094,803 | 816,496 | 892,868 |
| Gross Profit | 50,313 | (34,160) | 1,301 | 111,713 | 672 | 221,157 |
| EBITDA | 155,482 | (181,388) | (226,047) | (38,185) | (197,300) | 47,797 |

**FOURTEENTH AVENUE CARTAGE CO., INC.**
**PRO FORMA FINANCIAL INFORMATION**
**PERIODS ENDING DECEMBER 31, 2020 THROUGH 2024**

# Exhibit D to Debtor's Disclosure Statement

| | APR 20 | MAY 20 | JUN 20 | JUL 20 | AUG 20 | SEP 20 | OCT 20 | NOV 20 | DEC 20 |
|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOW ANALYSIS** | | | | | | | | | |
| BEGINNING CASH | 61,443 | 197,328 | 176,503 | 66,766 | 168,760 | 274,262 | 310,889 | 260,237 | 296,947 |
| RECEIPTS | | | | | | | | | |
| SALES COLLECTIONS - FCA | 1,137,502 | 922,093 | 1,029,250 | 1,331,317 | 1,452,136 | 1,406,362 | 1,406,362 | 1,472,273 | 1,307,495 |
| SALES COLLECTIONS - INTERMODAL | 110,759 | 159,198 | 144,572 | 158,465 | 194,759 | 209,276 | 203,776 | 203,776 | 211,695 |
| OVER 90 DAY COLLECTIONS | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| OTHER SALES COLLECTIONS | 770 | 1,749 | 1,627 | 1,789 | 1,789 | 1,708 | 1,708 | 1,789 | 1,586 |
| TOTAL RECEIPTS | 1,254,031 | 1,088,040 | 1,180,448 | 1,496,571 | 1,653,684 | 1,622,345 | 1,616,845 | 1,682,838 | 1,525,776 |
| DISBURSEMENTS | | | | | | | | | |
| BROKERS / DRIVER SERVICES | 107,583 | 143,900 | 231,340 | 272,469 | 314,582 | 314,582 | 329,324 | 292,469 | 314,582 |
| LABOR: | | | | | | | | | |
| DRIVER WAGES | 95,129 | 93,894 | 95,540 | 95,540 | 94,717 | 94,717 | 95,540 | 93,483 | 94,717 |
| ADMINISTRATIVE & SELLING | 70,629 | 74,120 | 74,120 | 74,120 | 74,120 | 74,120 | 74,120 | 74,120 | 74,120 |
| PAYROLL TAXES | 12,740 | 11,594 | 11,594 | 11,594 | 11,594 | 11,594 | 11,594 | 11,594 | 11,594 |
| OPERATING EXPENSES | | | | | | | | | |
| FUEL | 133,110 | 127,609 | 161,169 | 207,379 | 225,850 | 218,837 | 218,837 | 228,929 | 203,700 |
| MAINTENANCE, REPAIRS, TIRES, ETC. | 60,273 | 47,000 | 59,600 | 90,800 | 98,100 | 95,000 | 95,000 | 99,100 | 89,700 |
| GENERAL & COMPENSATION INSURANCE | 78,679 | 78,679 | 78,679 | 78,679 | 78,679 | 78,679 | 78,679 | 78,679 | 78,679 |
| GROUP INSURANCE | 11,717 | 10,545 | 10,545 | 10,545 | 11,072 | 11,072 | 11,072 | 11,072 | 11,072 |
| EQUIPMENT RENTAL | 430,668 | 388,525 | 399,751 | 381,933 | 481,933 | 531,933 | 531,933 | 552,762 | 552,762 |
| SECURITY | 10,138 | 11,760 | 9,408 | 9,408 | 11,760 | 9,408 | 9,408 | 11,760 | 9,408 |
| HIGHWAY USE, OTHER TAXES & LICENSES | 176 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| OTHER OPERATING EXPENSES | 6,116 | 10,072 | 10,072 | 10,072 | 10,072 | 10,072 | 10,072 | 10,072 | 10,072 |

**FOURTEENTH AVENUE CARTAGE CO., INC.**
**PRO FORMA FINANCIAL INFORMATION**
**PERIODS ENDING DECEMBER 31, 2020 THROUGH 2024**

| | APR 20 | MAY 20 | JUN 20 | JUL 20 | AUG 20 | SEP 20 | OCT 20 | NOV 20 | DEC 20 |
|---|---|---|---|---|---|---|---|---|---|
| SELLING EXPENSES | | 2,000 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| ADMINISTRATIVE EXPENSES | | | | | | | | | |
| OFFICE SUPPLIES & SERVICE CONTRACTS | 6,241 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 |
| RENT | 9,350 | 9,350 | 9,350 | 1,907 | 1,907 | 1,907 | 1,907 | 1,907 | 1,907 |
| GENERAL INSURANCE | 6,017 | 6,017 | 6,017 | 6,017 | 6,017 | 6,017 | 6,017 | 6,017 | 6,017 |
| GROUP INSURANCE | 21,730 | 23,301 | 23,301 | 23,301 | 24,466 | 24,466 | 24,466 | 24,466 | 24,466 |
| TELEPHONE & UTILITIES | 130 | 10,200 | 9,200 | 9,200 | 9,200 | 9,200 | 9,200 | 10,200 | 11,200 |
| PROPERTY TAXES | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 |
| LEGAL & PROFESSIONAL | 32,000 | 10,000 | 50,000 | 40,000 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 |
| OTHER ADMINISTRATIVE EXPENSES | 5,022 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| | | | | | | | | | |
| INTEREST - LINE OF CREDIT | | | | | | | | | |
| INTEREST | 10,740 | 10,689 | 10,638 | | | | | | |
| STATE INCOME TAX | | | | | | | | | |
| TOTAL DISBURSEMENTS | 1,111,386 | 1,102,054 | 1,283,323 | 1,355,964 | 1,509,570 | 1,547,105 | 1,562,670 | 1,562,130 | 1,549,497 |
| NET CASH FLOW FROM OPERATIONS | 142,645 | (14,014) | (102,875) | 140,607 | 144,115 | 75,240 | 54,175 | 120,708 | (23,722) |
| | | | | | | | | | |
| REORGANIZATION PLAN PAYMENTS | | | | | | | | | |
| CHEMICAL BANK - 3236 LINE OF CREDIT | 6,760 | 6,811 | 6,862 | 4,642 | 4,642 | 4,642 | 4,642 | 4,642 | 4,642 |
| CHEMICAL BANK - 4357 EQUIPMENT LINE | | | | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 |
| CHEMICAL BANK - MORTGAGE | | | | 2,674 | 2,674 | 2,674 | 2,674 | 2,674 | 2,674 |
| CHEMICAL BANK - EQUIPMENT LOAN | | | | 26,218 | 26,218 | 26,218 | 26,218 | 5,388 | 5,388 |
| TOTAL CHEMICAL BANK PLAN PAYMENTS | | | | 38,613 | 38,613 | 38,613 | 38,613 | 17,784 | 17,784 |
| CURE, 20 DAY & PROFESSIONAL FEES | | | | | | | 66,214 | 66,214 | 66,214 |
| GENERAL UNSECURED CLAIMS | | | | | | | | | |
| | | | | | | | | | |
| CASH BALANCE | 197,328 | 176,503 | 66,766 | 168,760 | 274,262 | 310,889 | 260,237 | 296,947 | 189,228 |
| | | | | | | | | | |
| BORROWINGS - LINE OF CREDIT | | | | | | | | | |
| **ENDING CASH** | 197,328 | 176,503 | 66,766 | 168,760 | 274,262 | 310,889 | 260,237 | 296,947 | 189,228 |

Confidential Information

2

4/23/2020

**FOURTEENTH AVENUE CARTAGE CO., INC.**
**PRO FORMA FINANCIAL INFORMATION**
**PERIODS ENDING DECEMBER 31, 2020 THROUGH 2024**

| | JAN 21 | FEB 21 | MAR 21 | TOTAL APR - DEC 21 | TOTAL 2021 | TOTAL 2022 | TOTAL 2023 | TOTAL 2024 |
|---|---|---|---|---|---|---|---|---|
| **CASH FLOW ANALYSIS** | | | | | | | | |
| | | | | | | | | |
| BEGINNING CASH | 189,228 | 167,088 | 130,986 | 55,110 | 189,228 | 322,023 | 769,749 | 906,190 |
| | | | | | | | | |
| RECEIPTS | | | | | | | | |
| | | | | | | | | |
| SALES COLLECTIONS - FCA | 1,406,362 | 1,322,144 | 1,322,144 | 12,646,751 | 16,697,402 | 17,581,808 | 17,663,888 | 18,140,512 |
| SALES COLLECTIONS - INTERMODAL | 203,776 | 203,776 | 193,657 | 1,832,719 | 2,433,927 | 2,037,569 | 2,037,569 | 2,098,696 |
| OVER 90 DAY COLLECTIONS | 5,000 | 5,000 | 5,000 | 45,000 | 60,000 | | | |
| OTHER SALES COLLECTIONS | 1,708 | 1,627 | 1,627 | 15,576 | 20,537 | 21,153 | 21,153 | 21,788 |
| | | | | | | | | |
| TOTAL RECEIPTS | 1,616,845 | 1,532,547 | 1,522,428 | 14,540,046 | 19,211,866 | 19,640,530 | 19,722,611 | 20,260,996 |
| | | | | | | | | |
| DISBURSEMENTS | | | | | | | | |
| BROKERS / DRIVER SERVICES | 331,993 | 302,267 | 331,993 | 2,869,032 | 3,835,285 | 3,950,344 | 4,068,854 | 4,190,920 |
| LABOR: | | | | | | | | |
| DRIVER WAGES | 98,406 | 90,065 | 98,406 | 878,876 | 1,165,754 | 1,200,727 | 1,236,749 | 1,273,851 |
| ADMINISTRATIVE & SELLING | 76,955 | 70,542 | 76,955 | 692,592 | 917,043 | 959,223 | 996,870 | 1,036,533 |
| PAYROLL TAXES | 15,213 | 14,594 | 15,920 | 109,437 | 155,164 | 159,057 | 163,051 | 167,150 |
| OPERATING EXPENSES | | | | | | | | |
| FUEL | 218,837 | 205,947 | 205,947 | 1,967,967 | 2,598,699 | 2,595,761 | 2,595,761 | 2,595,761 |
| MAINTENANCE, REPAIRS, TIRES, ETC. | 81,500 | 76,300 | 76,300 | 733,200 | 967,300 | 995,186 | 1,025,042 | 1,055,793 |
| GENERAL & COMPENSATION INSURANCE | 78,679 | 78,679 | 78,679 | 708,113 | 944,150 | 972,475 | 1,001,649 | 1,031,699 |
| GROUP INSURANCE | 11,072 | 11,072 | 11,072 | 99,650 | 132,867 | 136,853 | 140,959 | 145,187 |
| EQUIPMENT RENTAL | 502,762 | 497,762 | 483,962 | 4,479,861 | 5,964,348 | 6,066,964 | 6,177,809 | 6,291,979 |
| SECURITY | 9,408 | 11,760 | 9,408 | 91,728 | 122,304 | 125,973 | 129,752 | 133,645 |
| HIGHWAY USE, OTHER TAXES & LICENSES | 10,000 | 10,000 | 10,000 | 90,000 | 120,000 | 123,600 | 127,308 | 131,127 |
| OTHER OPERATING EXPENSES | 15,072 | 15,072 | 15,072 | 95,644 | 140,859 | 145,084 | 149,437 | 153,920 |

Confidential Information
3
4/23/2020

**FOURTEENTH AVENUE CARTAGE CO., INC.**
**PRO FORMA FINANCIAL INFORMATION**
**PERIODS ENDING DECEMBER 31, 2020 THROUGH 2024**

| | JAN 21 | FEB 21 | MAR 21 | TOTAL APR - DEC 21 | TOTAL 2021 | TOTAL 2022 | TOTAL 2023 | TOTAL 2024 |
|---|---|---|---|---|---|---|---|---|
| SELLING EXPENSES | 200 | 200 | 200 | 1,800 | 2,400 | 2,400 | 2,400 | 2,400 |
| ADMINISTRATIVE EXPENSES | | | | | | | | |
| OFFICE SUPPLIES & SERVICE CONTRACTS | 6,600 | 6,600 | 6,600 | 59,400 | 79,200 | 80,784 | 82,400 | 84,048 |
| RENT | 1,907 | 1,907 | 1,907 | 17,164 | 22,886 | 24,081 | 25,300 | 26,544 |
| GENERAL INSURANCE | 6,017 | 6,017 | 6,017 | 54,153 | 72,204 | 73,648 | 75,121 | 76,623 |
| GROUP INSURANCE | 24,466 | 24,466 | 24,466 | 220,194 | 293,593 | 299,464 | 305,454 | 311,563 |
| TELEPHONE & UTILITIES | 12,200 | 12,700 | 12,700 | 89,800 | 127,400 | 129,948 | 132,547 | 135,198 |
| PROPERTY TAXES | 3,200 | 3,200 | 3,200 | 28,800 | 38,400 | 39,168 | 39,951 | 40,750 |
| LEGAL & PROFESSIONAL | 22,500 | 17,500 | 17,500 | 132,500 | 190,000 | 120,000 | 122,400 | 124,848 |
| OTHER ADMINISTRATIVE EXPENSES | 13,000 | 13,000 | 13,000 | 117,000 | 156,000 | 159,120 | 162,302 | 165,548 |
| | | | | | | | | |
| INTEREST - LINE OF CREDIT | | | | | | | | |
| INTEREST | | | | | | | | |
| STATE INCOME TAX | | | | | | | | |
| | | | | | | | | |
| TOTAL DISBURSEMENTS | 1,539,988 | 1,469,651 | 1,499,306 | 13,536,912 | 18,045,856 | 18,359,861 | 18,761,116 | 19,175,088 |
| | | | | | | | | |
| NET CASH FLOW FROM OPERATIONS | 76,858 | 62,896 | 23,122 | 1,003,135 | 1,166,010 | 1,280,669 | 961,494 | 1,085,908 |
| | | | | | | | | |
| REORGANIZATION PLAN PAYMENTS | | | | | | | | |
| CHEMICAL BANK - 3236 LINE OF CREDIT | 4,642 | 4,642 | 4,642 | 41,780 | 55,706 | 55,706 | 55,706 | 55,706 |
| CHEMICAL BANK - 4357 EQUIPMENT LINE | 5,079 | 5,079 | 5,079 | 45,713 | 60,950 | 60,950 | 60,950 | 60,950 |
| CHEMICAL BANK - MORTGAGE | 2,674 | 2,674 | 2,674 | 24,065 | 32,087 | 32,087 | 32,087 | 32,087 |
| CHEMICAL BANK - EQUIPMENT LOAN | 5,388 | 5,388 | 5,388 | 48,495 | 64,660 | 64,660 | 64,660 | 64,660 |
| TOTAL CHEMICAL BANK PLAN PAYMENTS | 17,784 | 17,784 | 17,784 | 160,053 | 213,404 | 213,404 | 213,404 | 213,404 |
| CURE, 20 DAY & PROFESSIONAL FEES | 66,214 | 66,214 | 66,214 | 360,170 | 558,812 | 331,540 | 323,650 | |
| GENERAL UNSECURED CLAIMS | 15,000 | 15,000 | 15,000 | 216,000 | 261,000 | 288,000 | 288,000 | 288,000 |
| | | | | | | | | |
| CASH BALANCE | 167,088 | 130,986 | 55,110 | 322,023 | 322,023 | 769,749 | 906,190 | 1,490,694 |
| | | | | | | | | |
| BORROWINGS - LINE OF CREDIT | | | | | | | | |
| | | | | | | | | |
| **ENDING CASH** | 167,088 | 130,986 | 55,110 | 322,023 | 322,023 | 769,749 | 906,190 | 1,490,694 |